Certain Underwriters at Lloyd's, London, and Certain London Marketing Insurance Companies (collectively "the Insurers") appeal from an order of the Jefferson Circuit Court, entered at the conclusion of a trial conducted from February 28 to March 10, 2005, and assessing damages against the Insurers in favor of the plaintiff, Southern Natural Gas Company ("Sonat"), for nearly $1 million. The Insurers have appealed that judgment but have also moved this Court for an expedited determination of appellate jurisdiction, contending that the order does not constitute a final judgment that can support an appeal. In particular, the Insurers assert that the order did not completely dispose of any single "claim for relief and that, consequently, the trial court's attempted certification of the "judgment" as final pursuant to Rule 54(b), Ala. R. Civ. P., was unavailing and should be vacated by this Court and the appeal dismissed. Based on our analysis set forth below, we agree.
 Background
Sonat operates approximately 14,000 miles of pipeline in the southeastern United States for the purpose of transporting natural gas to markets in a seven-state area. As Sonat explains in the complaint it filed to institute the underlying litigation, its "integrated pipeline operations" include, among other operational features, numerous "compressor stations," including 11 located in Alabama, and numerous "mercury-metering stations," including 131 located in Alabama. The Insurers provide a balanced summary of the circumstances giving rise to the action in their principal brief to this Court:
 "From 1957 to 1972, Sonat used a PCB-based[1]
synthetic lubricant at many of its compressor stations. Environmental testing performed by Sonat in 1989 revealed that 13 of its 38 compressor stations had PCB contamination. Sonat also allegedly sustained environmental damage to its property at 14,700 other sites, including 25 additional compressor stations; 650 mercury metering stations; 14,000 liquid removal points; five manufactured gas plants; and 20 offshore platforms. Sonat voluntarily undertook to remediate the contamination at its sites.
 "In 1991 Sonat put [the Insurers] on notice that it had discovered contamination at 13 of its compressor stations and that it had taken action to contain and remediate the contamination. In November 1995, counsel for [the Insurers] sent Sonat a reservation of rights letter with respect to the claim made by Sonat. In 1996 Sonat advised [the Insurers] that the cleanup had been completed and that [the Insurers] should close their files on the claim."
(The Insurers' brief, pp. 6-7.)
In the action it subsequently filed against the Insurers, Sonat asserted that the Environmental Protection Agency, "other governmental agencies and departments and/or private parties," including Alabama residents, "have brought or asserted lawsuits, claims, and demands against Sonat alleging property damage, personal injury, bodily injury, and other damages and causes of action, including, without limitation, nuisance, trespass, negligence and strict liability, allegedly as a *Page 24 
result of Sonat's operations and ownership" of the pipeline system. Sonat asserted that it had "paid substantial amounts under legal obligation for the remediation of damage in, at, and around the vicinity of compressor stations, and for mercury damage arising from mercury meters." Sonat went on to explain that the contamination experienced at the compressor stations involved principally the presence of PCBs and the contamination at the mercury-metering stations involved principally "the presence of mercury in the ground water, surface water, air and general environment in, at, around, and in the vicinity of the mercury-metering stations."
Sonat stated in its complaint that the Insurers had issued various policies of liability insurance, covering successive policy periods commencing on November 30, 1949, and concluding on December 1, 1987, which entitled Sonat to coverage "for all sums, including costs of investigation and defense and legal liabilities, arising out of environmental and tort actions. . . ." In paragraph 32 of the complaint (captioned "Environmental and Tort Action Concerning Reform, Alabama[,] Compressor Station"), Sonat alleged:
 "Claims, demands and suits have been asserted against Sonat concerning property damage and other damages arising out of Sonat's operation of the Reform, Alabama[,] compressor station. The claimants in the environmental actions, allege, inter alia, damage and other in-jury based on purported damage including the presence of polychlorinated biphenyls and other substances of concern in the environment in, at, around, and in the vicinity of the Reform, Alabama[,] compressor station. Claimants seek damages for past and future response costs for alleged property damage which is continuous and progressive, beginning in or before 1949 and extending until at least 1986. The monies spent and to be spent in response to demands of a governmental agency, or a private party are `damages' under the Liability Insurance Policies[2] Alabama Plating Co. v. United States Fidelity and Guar. Co., 690 So.2d 331
(Ala. 1996). As such, the Liability Insurance Policies respond to and are required to pay for all damage because of property damage, bodily injury or personal injury (or a combination thereof) which Sonat is or becomes legally obligated to pay as respects the Reform, Alabama[,] compressor station. Sonat has paid, and is likely to continue to become legally obligated to pay, damages arising from the Reform, Alabama[,] compressor station."
By means of the next four paragraphs of its complaint, introduced by identical captions except for the name of the location of the compressor station, and making identical averments, Sonat made precisely parallel allegations concerning the compressor stations located at Elmore, Gallion, McConnells, and Tarrant, Alabama.
Thereafter, Sonat undertook in its complaint to delineate five separately captioned claims for relief. The claims respectively asserted that although the Insurers were obligated to pay in full Sonat's legal liabilities arising out of or in connection with the previously described "environmental and tort actions," the Insurers had "failed, or threatened to fail, to fulfill, or acknowledge completely their insuring obligations to pay in full Sonat's legal liabilities"; that *Page 25 
there was an actual and justiciable controversy as to the Insurers' obligations in that regard (first claim for relief); that the Insurers had breached their insuring obligations to Sonat and were obligated to pay Sonat "all direct, indirect, consequential, incidental, special, compensatory and other damages resulting from" the breaches of contract (second claim for relief); that the conduct of the Insurers effected a waiver of their right "to enforce any contractual obligation, limitation, exclusion, or other provisions running in [their] favor" and Sonat was entitled to a judicial declaration to that effect (third claim for relief); that the Insurers had breached their contracts of insurance by "disclosing confidences of Sonat and confidential settlement communications of Sonat in violation of their contractual duties to act with good faith and with reasonable care and prudence with regard to their insured," thereby waiving the Insurers'"ability to enforce any contractual obligation, limitation, exclusion, or other provision running in [their] favor," entitling Sonat to a judicial declaration to that effect (fourth claim for relief); and that the conduct of the Insurers represented an anticipatory breach of contract entitling Sonat to recover damages (fifth claim for relief). In its concluding "prayer for relief," Sonat demanded judgment by way of a judicial declaration that the Insurers were "obligated to pay or reimburse in full Sonat's cost and expenses for investigation and defense of the environmental and tort actions and to pay or reimburse in full Sonat's legal liabilities in connection with said environmental and tort actions" and to pay an award for "compensatory damages in an amount or amounts to be determined by the trier of fact at trial, and attorneys' fees and costs."
Eventually, the trial court entered two case-management orders pertinent to the jurisdictional issue before this Court. The first order provided:
 "Considering the number of sites at issue in this litigation and the complexity of the issues involved, it is necessary that the trial of this matter be conducted in phases, as follows:
 "Trial Phase I: Trial Phase I shall involve the parties' claims and defenses relative to the availability of insurance coverage for a subset of those sites listed in Exhibit `A' ('Phase I Sites'), as agreed to by the parties or ordered by the Court in the future."
Exhibit A listed dozens of "compressor stations/PCBs" in Alabama, Georgia, Louisiana, and Mississippi, several hundred "meter and compressor stations/mercury" located in Florida, South Carolina, Alabama, Georgia, Louisiana, Texas, and Tennessee, and several dozen "offshore facilities." The second case-management order explained that "[t]he initial trial phrase in this action shall focus on the claims and defenses related to the Tarrant, Alabama, and Reform, Alabama, locations," those being two of the Alabama "compressor stations/PCBs" identified on Exhibit A to the first case-management order.
At the conclusion of the trial relating to those two sites, the jury responded to a set of 14 special interrogatories, identifying 9 separate policies as having been in existence and finding 1) that an "occurrence" had occurred under both definitions of that term in the two applicable insurance policies; 2) that notice to the Insurers of any occurrence was not late with respect to either the Tarrant or the Reform compressor station; 3) that Sonat had not waived its claim; 4) that "a single occurrence caused the property damage[ ] at Tarrant compressor station and Reform compressor station"; 5) that at both locations there was damage to property owned by third *Page 26 
parties other than Sonat; 6) that the property damage at both stations began in 1957 and ended in 1988; 7) that the amounts paid by Sonat with respect to both compressor stations were paid because Sonat "was legally obligated to pay them as damages"; 8) that soil contamination at the two sites was not "expected or intended" by Sonat; 9) that the Insurers had breached the contracts, doing so on November 13, 1995; and 10) specifying the total amounts Sonat was entitled to recover "as a result of PCB contamination" at each site. Lastly, the jury declared that three specific policies were "excess of $50,000 in underlying insurance."
The PCB contamination at the various compressor stations resulted from Sonat's use throughout its system of the synthetic lubricant "Pydraul," composed partly of PCBs. In moving the trial court for the entry of a judgment in response to the jury's answers to the special interrogatories, Sonat asserted that its "damages were, in fact, caused by the systematic use of Pydraul, causing damages at the compressor stations, which constitutes a single occurrence." The Insurers opposed the entry of a final judgment, arguing that the only authority for such a judgment would be Rule 54(b), Ala. R. Civ. P., but contending that the court could not certify its order under that rule because none of Sonat's claims had been completely resolved. The first sentence of Rule 54(b) provides:
 "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."
(Emphasis supplied.)
 Rule 42(b), Ala. R. Civ. P., provides:
 "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by Article 1, Section 11 of the Alabama Constitution of 1901."
(Emphasis supplied.)
The Insurers argued to the trial court that instead of certifying its order under Rule 54(b), the court should certify appropriate issues for an interlocutory appeal pursuant to Rule 5, Ala. R.App. P. The Insurers committed that they could stipulate with Sonat the issues the court could certify for an interlocutory appeal taken pursuant to Rule 5. On June 17, 2005, the trial court entered its "judgment" in favor of Sonat against the Insurers for monetary damages and stating, with respect to the issue of Rule 54(b) certification, the following:
 "Defendants contend that a partial final judgment is not appropriate. In Grantham v. Vanderzyl, 802 So.2d 1077 (AIa.2001), it was held that the trial court's decision to dismiss claims for loss of income and fear of contracting a communicable disease were not properly certified as final. The order dismissing the claim on the tort of outrage was appealable.
 "In Norfolk Southern Corp. v. California Union Ins. Co., 859 So.2d 167 (La.Ct.App. 2003), an appeal was taken involving only alleged contamination sites *Page 27 
in Louisiana although the petition alleged sites in other states.
 "In this case the parties agreed to try the issues on the sites at Tarrant and Reform. All the issues on these sites were tried. Therefore, it appears that a final judgment on these claims is appropriate.
 ". . .
 "The judgment is certified as final pursuant to Rule 54(b), there being no cause for delay and entry of judgment should be final."
 Analysis
It is clear that in this case the trial court did not order a "severance" of the claims relating to the Reform and Tarrant compressor stations, pursuant to Rule 21, Ala. R.App. P. ("any claim against a party may be severed and proceeded with separately"), but rather simply ordered separate trials of those issues pursuant to Rule 42(b), Ala. R. Civ. P. SeeKey v. Robert M. Duke Ins. Agency, 340 So.2d 781
(Ala. 1976).
 "As this Court stated in Foster v. Greer Sons, Inc., 446 So.2d 605, 610 (Ala. 1984), `Rule 54(b) certifications should be granted only in exceptional cases and "should not be entered routinely or as a courtesy or accommodation to counsel." Page v. Preisser, 585 F.2d 336, 339 (8th Cir.1978).' The Committee comments to Rule 54 note:
 "`The rule provides that, in the absence of affirmative action by the judge, no decision is final until the entire case has been adjudicated. The one exception is that where the court has completely disposed of one of a number of claims, or one of multiple parties, and has made an express determination that there is no just reason for delay, the court may direct the entry of judgment on that claim or as to that party.' (Emphasis added).
"Committee comments, Rule 54, [Ala. R. Civ. P.]
 "The question before this Court is whether the partial summary judgment LSC received completely disposed of a claim so as to make that judgment final. Rule 54(b) does not authorize the entry of final judgment on part of a single claim. Tolson v. United States, 732 F.2d 998, 999 (D.C. Cir.1984). Neither federal nor state courts have been able to settle on a single test to determine when claims are separate or exactly what constitutes a claim. See, Tolson, 732 F.2d at 1001; Cotes v. Bush, 293 Ala. 535, 307 So.2d 6 (1975). However, authorities have stated that `when plaintiff is suing to vindicate one legal right and alleges several elements of damage, only one claim is presented and subdivision (b) [of rule 54] does not apply.' 10 C. Wright, A. Miller, M. Kane, Federal Practice and Procedure: Civil 2d, § 2657, at 69-71 (1983); Landry v. G.B.A., 762 F.2d 462, 464 (5th Cir. 1985)."
Precision American Corp. v. Leasing Serv. Corp.,505 So.2d 380, 381 (Ala. 1987).
 "The sine qua non of [Rule 54's] applicability is the existence of multiple parties or claims. The rule confers appellate jurisdiction over an order of judgment only where the trial court `has completely disposed of one of a number of claims, or one of multiple parties.' Rule 54(b), committee comments (emphasis added). In other words, the `trial court cannot confer appellate jurisdiction upon this court through directing entry of judgment under Rule 54(b) if the judgment is not otherwise "final."' Robinson v. Computer Servicenters, Inc., 360 So.2d 299 (Ala. 1978). `That a judgment is not final when the amount *Page 28 
of damages has not been fixed by it is unquestionable.' 'Automatic' Sprinkler Corp. of America v. B.F. Goodrich Co., 351 So.2d 555, 557 (Ala. 1977); see also Moody v. State ex rel. Payne, 351 So.2d 547 (Ala. 1977)."
Tanner v. Alabama Power Co., 617 So.2d 656, 656-57
(Ala. 1993).
"[F]or a Rule 54(b) certification of finality to be effective, it must fully adjudicate at least one
claim or fully dispose of the claims as they relate to at least one party." Haynes v. Alfa Fin. Corp.,730 So.2d 178, 181 (Ala. 1999).
 "If an order does not completely dispose of or fully adjudicate at least one claim, a court's Rule 54(b) certification of the order is not effective. See Haynes v. Alfa Fin. Corp., 730 So.2d 178 (Ala. 1999). Damages are only one portion of a claim to vindicate a legal right, even though the damages claimed may consist of several elements. See id. at 181. An order is not final if it permits a party to return to court and prove more damages or if it leaves open the question of additional recovery. See Precision American Corp. v. Leasing Serv. Corp., 505 So.2d 380, 382 (Ala. 1987)."
Grantham v. Vanderzyl, 802 So.2d 1077, 1080
(Ala. 2001).
 "To be sure, the trial court recited the formula for certification of a judgment pursuant to Rule 54(b), Ala. R. Civ. P. However, `[n]ot every order has the requisite element of finality that can trigger the operation of Rule 54(b).' Goldome Credit Corp. v. Player, 869 So.2d 1146, 1147 (Ala.Civ.App. 2003) (emphasis added). A claim is not eligible for Rule 54(b) certification unless it has been completely resolved by the judgment. In that regard, it must be remembered that `[d]amages are [an element] of a claim to vindicate a legal right.' Grant-ham v. Vanderzyl, 802 So.2d 1077, 1080 (Ala. 2001).
 "`Where the amount of damages is an issue, . . . the recognized rule of law in Alabama is that no appeal will lie from a judgment which does not adjudicate that issue by ascertainment of the amount of those damages.' Moody v. State ex rel. Payne, 351 So.2d 547, 551 (Ala. 1977). `That a judgment is not final when the amount of damages has not been fixed by it is unquestionable.' Automatic' Sprinkler Corp. of America v. B.F. Goodrich Co., 351 So.2d 555, 557 (Ala. 1977) (recitation of the Rule 54(b) formula was ineffective to render appealable a judgment that resolved liability, but reserved the issue of damages for future resolution). `[T]he trial court cannot confer appellate jurisdiction upon this [C]ourt through directing entry of judgment under Rule 54(b) if the judgment is not otherwise "final."' Robinson v. Computer Servicenters, Inc., 360 So.2d 299, 302
(Ala. 1978). Thus, it is well-established that a claim for which damages are sought is insufficiently adjudicated for Rule 54(b) purposes until the element of damages is resolved; a judgment resolving only liability in an action seeking damages cannot be certified as final pursuant to Rule 54(b). Tanner v. Alabama Power Co., 617 So.2d 656 (Ala. 1993).
 "That this case suffers from this defect is self-evident. The trial court purported to certify for appellate review the default judgment of 35 counterclaims, 29 of which sought damages
that are yet to be determined. Because the trial court's order was ineffective to confer appellate jurisdiction over those counterclaims, the judgment, as it relates to the 29 counterclaims seeking damages, is nonfinal and nonrenewable at this time." *Page 29 
Dzwonkowski v. Sonitrol of Mobile, Inc.,892 So.2d 354, 361-62 (Ala. 2004).
The trial court's reliance on Norfolk Southern Corp. v.California Union Insurance Co., 859 So.2d 167
(La.Ct.App. 2003), was misplaced. For one thing, all of the "numerous environmental sites" involved in that case had "proceeded to trial either separately or in groups of sites located in the same state," with the appeal before the Louisiana Court of Appeals dealing only with judgments concerning the sites in Louisiana. Norfolk SouthernCorp., 859 So.2d at 172 n. 4. More importantly, as the Insurers point out in their reply brief, noting their participation as appellants in Norfolk Southern, the appeal was brought pursuant to a provision of the Louisiana Code of Civil Procedure allowing for a "suspension appeal," a procedure foreign to the Alabama Rules of Civil Procedure and the Alabama Rules of Appellate Procedure. As the Insurers explain:
 "In 1997, the Louisiana legislature adopted Article 1915 of the Louisiana Code of Civil Procedure. Article 1915 addresses the problem of partial judgments, or judgments on less than an entire claim or less than all parties in a multi-party litigation. Included in Article 1915 is an exclusive list of partial judgments that under Louisiana Law are immediately appealable partial final judgments. One such partial judgment is a judgment on an issue of liability where the liability issue has been tried separately by the court or when in a jury trial, the issue of liability has been tried before a jury and the issue of damages is to be tried before a different jury. Article 1915 allowed [the Insurers] to appeal the legal issues of its liability for coverage to Norfolk Southern notwithstanding the fact that damages at other sites had not yet been determined."
(The Insurers' reply brief, pp. 9-10.)
In its oppositions to the summary-judgment motion the Insurers unsuccessfully filed, Sonat argued, in pertinent part:[3]
 "[The Insurers] may not ignore that [Sonat's] pipeline operations, and the PCB remedial activities at its compressor stations, were unitary. It would be inappropriate to view either of the two trial sites individually as opposed to being a part of the unitary system or unitary cleanup. . . .
 "The fact that two of the thirteen compressor stations are identified for early trial is one of convenience for judicial administration, and neither an overt or tacit admission that [Sonat's] compressor stations should be treated separately. . . ."
 ____________
 "The fact that an initial trial is scheduled to focus on only two of the thirteen compressor stations where PCB-related damage [was] found does not somehow alter the unitary nature of [Sonat's] operations, and does not magically transform the legal effect of such unitary operations' — that the several losses constitute a single occurrence. . . . [Sonat] has always maintained, and still does today, that the operation of its unitary pipeline system constitutes a single occurrence under the [Insurers'] policies. . . .
 ". . . *Page 30 
 "The policy language and facts of this claim dictate a single occurrence. The unitary nature of the pipeline operation, the single cause of the contamination, the unitary nature of the type and location of contamination at all of the stations and the unitary nature of the remediation support a single occurrence."
As pleaded and presented by Sonat, and as consistently argued by it throughout this litigation, there exists a single claim, expressly predicated on an allegedly "single occurrence," followed by a single denial of coverage by the Insurers, thereby entitling Sonat to obtain declaratory relief and to recover damages for breach of contract. With respect to the PCB contamination at its "integrated operations at compressor stations," Sonat has expressly asserted that there was one continuous exposure over the course of the policy periods to the same PCBs emanating from the same synthetic lubricant. Sonat has emphasized throughout this litigation that it undertook a single project to investigate and remediate the damage it discovered throughout its integrated system of compressor stations. In short, Sonat has asserted the unitary nature of its pipeline operation, including the unitary nature of the type and location of contamination at all of the compressor stations and has expressly asserted in the trial court that its remedial activities at its compressor stations were likewise unitary.
Sonat's action seeks to recover globally for a single occurrence. At the very least, and independent of the interrelationships among the course of events and resulting damage at various other locations along its pipeline system, Sonat's claims for relief seek to "`vindicate one legal right and allege[ ] several elements of damage'" with respect to claims for declaratory relief and damages relating to the PCB contamination at the Reform, Elmore, Gallion, McConnells, and Tarrant, Alabama, compressor stations. Precision AmericanCorp., 505 So.2d at 381 (quoting 10 C. Wright, A. Miller M. Kane, Federal Practice and Procedure: Civil2d, § 2657, at 69-71 (1983)).
 Conclusion
Although disposing of the parties' claims and defenses relative to the "availability of insurance coverage" for the Reform and Tarrant sites, the order entered by the trial court following the Phase I trial necessarily "leaves open the question of additional damages" with respect to the other three compressor stations. Accordingly, we need not decide whether there is simply one claim for relief asserted in Sonat's complaint, or whether recognition for some separate claims could be justified, as for example, with respect to mercury contamination at mercury-metering stations as opposed to PCB contamination at compressor stations. All that is necessary to resolve the jurisdictional issue at this stage is that we are clear to the fact that, at a minimum, the identically phrased assertions relating to the events, and resulting damage, at the five compressor stations represents a single claim for relief and that the trial court has not completely disposed of that claim for relief.
Therefore, we are compelled to dismiss this appeal as being from a nonfinal order.
APPEAL DISMISSED.
NABERS, C.J., and SEE, LYONS, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
[1] "PCB" is an acronym for polychlorinated biphenyl.
[2] The "Liability Insurance Policies" referred to in the complaint are those "Known Primary, Umbrella and Excess General Liability Insurance Policies Issued to [Sonat,] by Certain Underwriters at Lloyd's" listed in Appendix 1 to Sonat's complaint. The policies there listed cover the period from November 30, 1949, to December 1, 1987.
[3] On January 7, 2005, Sonat filed two documents in opposition to the Insurers' summary-judgment motion; one was entitled "Opposition to Motion for Summary Judgment Regarding Owned Property," and one was entitled "Opposition to Defendants' Motion for Summary Judgment Regarding Number of Occurrences." The quoted material is taken from both documents. *Page 31