PER CURIAM.
Certain Underwriters at Lloyd’s, London, and Certain London Marketing Insurance Companies (collectively “the Insurers”) appeal from an order of the Jefferson Circuit Court in favor of the plaintiff, Southern Natural Gas Company (“Sonat”), certified under Rule 54(b), Ala. R. Civ. P., as a final judgment. We dismiss the appeals.

Facts and Procedural History

This is the second time the underlying action has come before this Court. See Certain Underwriters at Lloyd’s, London v. Southern Natural Gas Co., 939 So.2d 21 (AIa.2006) (“Lloyd’s /”). As this Court noted in Lloyd’s I:
“Sonat operates approximately 14,000 miles of pipeline in the southeastern United States for the purpose of transporting natural gas to markets in a seven-state area. As Sonat explains in the complaint it filed to institute the underlying litigation, its ‘integrated pipeline operations’ include, among other operational features, numerous ‘compressor stations,’ including 11 located in Alabama, and numerous ‘mercury-metering stations,’ including 131 located in Alabama. The Insurers provide a balanced summary of the circumstances giving rise to the action in their principal brief to this Court:
“ ‘From 1957 to 1972, Sonat used a PCB-based synthetic lubricant at many of its compressor stations.[1] Environmental testing performed by *58 Sonat in 1989 revealed that 13 of its 38 compressor stations had PCB contamination. Sonat also allegedly sustained environmental damage to its property at 14,700 other sites, including 25 additional compressor stations; 650 mercury metering stations; 14,000 liquid removal points; five manufactured gas plants; and 20 offshore platforms. Sonat voluntarily undertook to remediate the contamination at its sites.
“ ‘In 1991 Sonat put [the Insurers] on notice that it had discovered contamination at 13 of its compressor stations and that it had taken action to contain and remediate the contamination. In November 1995, counsel for [the Insurers] sent Sonat a reservation of rights letter with respect to the claim made by Sonat. In 1996 Sonat advised [the Insurers] that the cleanup had been completed and that [the Insurers] should close their files on the claim.’
“(The Insurers’ brief, pp. 6-7.)
“In the action it subsequently filed against the Insurers, Sonat asserted that the Environmental Protection Agency, ‘other governmental agencies and departments and/or private parties,’ including Alabama residents, ‘have brought or asserted lawsuits, claims, and demands against Sonat alleging property damage, personal injury, bodily injury, and other damage[ ] and causes of action, including, without limitation, nuisance, trespass, negligence and strict liability, allegedly as a result of Sonat’s operations and ownership’ of the pipeline system. Sonat asserted that it had ‘paid substantial amounts under legal obligation for the remediation of damage in, at, and around the vicinity of compressor stations, and for mercury damage arising from mercury meters.’ Sonat went on to explain that the contamination experienced at the compressor stations involved principally the presence of PCBs and the contamination at the mercury-metering stations involved principally ‘the presence of mercury in the ground water, surface water, air and general environment in, at, around, and in the vicinity of the mercury-metering stations.’
“Sonat stated in its complaint that the Insurers had issued various policies of liability insurance, covering successive policy periods commencing on November 30, 1949, and concluding on December 1, 1987, which entitled Sonat to coverage ‘for all sums, including costs of investigation and defense and legal liabilities, arising out of environmental and tort actions.... ’ In paragraph 32 of the complaint (captioned ‘Environmental and Tort Action Concerning Reform, Alabama[,] Compressor Station’), Sonat alleged:
“‘Claims, demands and suits have been asserted against Sonat concerning property damage and other damages arising out of Sonat’s operation of the Reform, Alabama[,] compressor station. The claimants in the environmental actions, allege, inter alia, damage and other injury based on purported damage including the presence of polychlorinated biphenyls and other substances of concern in the environment in, at, around, and in the vicinity of the Reform, Alabama!,] compressor station. Claimants seek damages for past and future response costs for alleged property damage which is continuous and progressive, beginning in or before 1949 and extending until at least 1986. The monies spent and to be spent in response to demands of a governmental agency, or a private party are “damages” under the Liability Insurance Policies.[2] Alabama *59 Plating Co. v. United States Fidelity and Guar. Co., 690 So.2d 331 (Ala. 1996). As such, the Liability Insurance Policies respond to and are required to pay for all damage because of propei’ty damage, bodily injury or personal injury (or a combination thereof) which Sonat is or becomes legally obligated to pay as respects the Reform, Alabama[,] compressor station. Sonat has paid, and is likely to continue to become legally obligated to pay, damages arising from the Reform, Alabama[,] compressor station.’
“By means of the next four paragraphs of its complaint, introduced by identical captions except for the name of the location of the compressor station, and making identical averments, Sonat made precisely parallel allegations concerning the compressor stations located at Elmore, Gallion, McConnells, and Tarrant, Alabama.
“Thereafter, Sonat undertook in its complaint to delineate five separately captioned claims for relief. The claims respectively asserted that although the Insurers were obligated to pay in full Sonat’s legal liabilities arising out of or in connection with the previously described ‘environmental and tort actions,’ the Insurers had ‘failed, or threatened to fail, to fulfill, or acknowledge completely their insuring obligations to pay in full Sonat’s legal liabilities’; that there was an actual and justiciable controversy as to the Insurers’ obligations in that regard (first claim for relief); that the Insurers had breached their insuring obligations to Sonat and were obligated to pay Sonat ‘all direct, indirect, consequential, incidental, special, compensatory and other damages resulting from’ the breaches of contract (second claim for relief); that the conduct of the Insurers effected a waiver of their right ‘to enforce any contractual obligation, limitation, exclusion, or other provisions running in [their] favor’ and Sonat was entitled to a judicial declaration to that effect (third claim for relief); that the Insurers had breached their contracts of insurance by ‘disclosing confidences of Sonat and confidential settlement communications of Sonat in violation of their contractual duties to act with good faith and with reasonable care and prudence with regard to their insured,’ thereby waiving the Insurers’ ‘ability to enforce any contractual obligation, limitation, exclusion, or other provision running in [their] favor,’ entitling Sonat to a judicial declaration to that effect (fourth claim for relief); and that the conduct of the Insurers represented an anticipatory breach of contract entitling Sonat to recover damages (fifth claim for relief). In its concluding ‘prayer for relief,’ Sonat demanded judgment by way of a judicial declaration that the Insurers were ‘obligated to pay or reimburse in full Sonat’s cost and expenses for investigation and defense of the environmental and tort actions and to pay or reimburse in full Sonat’s legal liabilities in connection with said environmental and tort actions’ and to pay an award for ‘compensatory damages in an amount or amounts to be determined by the trier of fact at trial, and attorneys’ fees and costs.’
“Eventually, the trial court entered two case-management orders pertinent to the jurisdictional issue before this Court. The first order provided:
“ ‘Considering the number of sites at issue in this litigation and the complexity of the issues involved, it is necessary that the trial of this matter be conducted in phases, as follows:
“ ‘Trial Phase I: Trial Phase I shall involve the parties’ claims and defenses relative to the availability of *60 insurance coverage for a subset of those sites listed in Exhibit “A” (“Phase I Sites”), as agreed to by the parties or ordered by the Court in the future.’
“Exhibit A listed dozens of ‘compressor stations/PCBs’ in Alabama, Georgia, Louisiana, and Mississippi, several hundred ‘meter and compressor stations/mercury’ located in Florida, South Carolina, Alabama, Georgia, Louisiana, Texas, and Tennessee, and several dozen ‘offshore facilities.’ The second case-management order explained that ‘[t]he initial trial [phase] in this action shall focus on the claims and defenses related to the Tarrant, Alabama, and Reform, Alabama, locations,’ those being two of the Alabama ‘compressor stations/PCBs’ identified on Exhibit A to the first case-management order.
“At the conclusion of the trial relating to those two sites, the jury responded to a set of 14 special interrogatories, identifying 9 separate policies as having been in existence and finding 1) that an ‘occurrence’ had occurred under both definitions of that term in the two applicable insurance policies; 2) that notice to the Insurers of any occurrence was not late with respect to either the Tarrant or the Reform compressor station; B) that So-nat had not waived its claim; 4) that ‘a single occurrence caused the property damage[ ] at Tarrant compressor station and Reform compressor station’; 5) that at both locations there was damage to property owned by third parties other than Sonat; 6) that the property damage at both stations began in 1957 and ended in 1988; 7) that the amounts paid by Sonat with respect to both compressor stations were paid because Sonat ‘was legally obligated to pay them as damages’; 8) that soil contamination at the two sites was not ‘expected or intended’ by Sonat; 9) that the Insurers had breached the contracts, doing so on November 13, 1995; and 10) specifying the total amounts Sonat was entitled to recover ‘as a result of PCB contamination’ at each site. Lastly, the jury declared that three specific policies were ‘excess of $50,000 in underlying insurance.’
“The PCB contamination at the various compressor stations resulted from Sonat’s use throughout its system of the synthetic lubricant ‘Pydraul,’ composed partly of PCBs. In moving the trial court for the entry of a judgment in response to the jury’s answers to the special interrogatories, Sonat asserted that its ‘damages were, in fact, caused by the systematic use of Pydraul, causing damage[] at the compressor stations, which constitutes a single occurrence.’ The Insurers opposed the entry of a final judgment, arguing that the only authority for such a judgment would be Rule 54(b), Ala. R. Civ. P., but contending that the court could not certify its order under that rule because none of Sonat’s claims had been completely resolved. The first sentence of Rule 54(b) provides:
“ ‘When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direet the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.’
“(Emphasis supplied.)
“Rule 42(b), Ala. R. Civ. P., provides:
“ ‘The court, in furtherance of convenience or to avoid prejudice, or when *61 separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by Article 1, Section 11 of the Alabama Constitution of 1901.’
“(Emphasis supplied.)
“The Insurers argued to the trial court that instead of certifying its order under Rule 54(b), the court should certify appropriate issues for an interlocutory appeal pursuant to Rule 5, Ala. R.App. P. The Insurers committed that they could stipulate with Sonat the issues the court could certify for an interlocutory appeal taken pursuant to Rule 5. On June 17, 2005, the trial court entered its ‘judgment’ in favor of Sonat against the Insurers for monetary damages and stating, with respect to the issue of Rule 54(b) certification, the following:
“ ‘Defendants contend that a partial final judgment is not appropriate....
[[Image here]]
“ ‘In this case the parties agreed to try the issues on the sites at Tarrant and Reform. All the issues on these sites were tried. Therefore, it appears that a final judgment on these claims is appropriate.
[[Image here]]
“ ‘The judgment is certified as final pursuant to Rule 54(b), there being no cause for delay and entry of judgment should be final.’
[[Image here]]
“[2]The ‘Liability Insurance Policies’ referred to in the complaint are those ‘Known Primary, Umbrella and Excess General Liability Insurance Policies Issued to [Sonat,] by Certain Underwriters at Lloyd’s’ listed in Appendix 1 to Sonat’s complaint....”
939 So.2d at 23-27.
Although the Insurers appealed that order of the trial court, they also
“moved this Court for an expedited determination of appellate jurisdiction, contending that the order [did] not constitute a final judgment that can support an appeal. In particular, the Insurers assert[ed] that the order did not completely dispose of any single ‘claim for relief and that, consequently, the trial court’s attempted certification of the ‘judgment’ as final pursuant to Rule 54(b), Ala. R. Civ. P., was unavailing and should be vacated by this Court and the appeal dismissed.”
939 So.2d at 23.
In Lloyd’s I, we first noted that the Phase I trials ordered by the trial court were, under Rule 42(b), Ala. R. Civ. P., separate trials of the issues relating to the Reform and Tarrant compressor stations and were not separate trials of independent claims for relief under Rule 21, Ala. R. Civ. P.[2] 939 So.2d at 27. Next, we quoted from several authorities discussing the requirements for an order to be properly certified as final under Rule 54(b), Ala. R. Civ. P. Ultimately, we concluded that the Rule 54(b) certification was ineffective. We stated:
“As pleaded and presented by Sonat, and as consistently argued by it throughout this litigation, there exists a single claim, expressly predicated on an *62 allegedly ‘single occurrence,’ followed by a single denial of coverage by the Insurers, thereby entitling Sonat to obtain declaratory relief and to recover damages for breach of contract. With respect to the PCB contamination at its ‘integrated operations at compressor stations,’ Sonat has expressly asserted that there was one continuous exposure over the course of the policy periods to the same PCBs emanating from the same synthetic lubricant. Sonat has emphasized throughout this litigation that it undertook a single project to investigate and remediate the damage it discovered throughout its integrated system of compressor stations. In short, Sonat has asserted the unitary nature of its pipeline operation, including the unitary nature of the type and location of contamination at all of the compressor stations and has expressly asserted in the trial court that its remedial activities at its compressor stations were likewise unitary.
“Sonat’s action seeks to recover globally for a single occurrence. At the very least, and independent of the interrelationships among the course of events and resulting damage at various other locations along its pipeline system, So-nat’s claims for relief seek to ‘ “vindicate one legal right and allege[ ] several elements of damage” ’ with respect to claims for declaratory relief and damages relating to the PCB contamination at the Reform, Elmore, Gallion, McConnells, and Tarrant, Alabama, compressor stations. Precision American Corp. [v. Leasing Sen. Corp.], 505 So.2d [380] at ⅜81 [ (Ala.1987) ] (quoting 10 C. Wright, A. Miller & M. Kane, Federal Practice
and Procedure: Civil 2d, § 2657, at 69-71 (1983)).
[[Image here]]
“Although disposing of the parties’ claims and defenses relative to the ‘availability of insurance coverage’ for the Reform and Tarrant sites, the order entered by the trial court following the Phase I trial necessarily ‘leaves open the question of additional damages’ with respect to the other three compressor stations. Accordingly, we need not decide whether there is simply one claim for relief asserted in Sonat’s complaint, or whether recognition for some separate claims could be justified, as for example, with respect to mercury contamination at mercury-metering stations as opposed to PCB contamination at compressor stations. All that is necessary to resolve the jurisdictional issue at this stage is that we are clear to the fact that, at a minimum, the identically phrased assertions relating to the events, and resulting damage, at the five compressor stations represents a single claim for relief and that the trial court has not completely disposed of that claim for relief.”
939 So.2d at 30.
After this Court dismissed the appeal in Lloyd’s I, the parties proceeded to the Phase II trial, which addressed 11 additional compressor-station sites. The Phase II jury found in favor of Sonat with respect to 6 of the 11 sites and awarded damages to Sonat.[3] Sonat then moved the trial court for entry of a judgment on the jury’s verdict and a certification of the judgment as final under Rule 54(b), Ala. R. Civ. P. The Insurers opposed the motion.
*63 In an order entered on April 24, 2008, the trial court granted Sonat’s motion.[4] In relevant part, the trial court’s order states:
“(A) Breach of Contract “Both the Phase I and the Phase II jury determined that [the Insurers] had breached them contract with [Sonat].
“(B) Policy Interpretation Issues “Pursuant to this Court’s prior rulings, and the Phases I and II jury verdicts, the Court finds that:
“1. The PCB[5] Remediation Program constituted an ‘occurrence’ as defined in the policies;
“2. The attachment points of the policies are $50,000;
“8. [Sonat] was legally obligated to pay for the remediation program, and [the costs for that program] therefore constitute damages under the policies;
“4. The PCB remediation program consisted of a single occurrence under the policies at issue.
“(C) Factual Determinations Made by the Finders of Fact
“1. The policies at issue exist;
“2. [Sonat] did not waive its claim against [the Insurers] for damages associated with the PCB remediation program;
“3. [Sonat] provided timely notice to [the Insurers] of its claim;
“4. [The Insurers] breached their contracts with [Sonat] on November 13,1995; and
“5. The covered damages commenced in 1957 and continued until 1988.
[[Image here]]
“(E) Prevailing Party
“[Sonat] was determined to be the prevailing party for Phase I on the issues presented to the jury. [Sonat] similarly prevailed on the issues presented to the Phase II jury.
“Therefore, it is ordered as follows:
“1. The [Insurers’] policies exist;
“2. The attachment points of policies CU1887, K11477, and CU10353 are $50,0000;
“3. [Sonat] did not waive its claim;
“4. The PCB Remediation Program was an ‘occurrence’ under the policies; “5. The PCB remediation expenses are recoverable as damages under the policies;
“6. [Sonat] provided timely notice;
“7. The PCB Remediation Program was a single occurrence;
“8. [The Insurers] breached their contracts with [Sonat] on November 13,1995;
“9. Judgment is entered in favor of [Sonat] and against [the Insurers] in the amount of $2,377,962.45, which constitutes the full amount for the Phase I and the Phase II sites; and “10. [Sonat] is the prevailing party, as it prevailed on its cause of action for breach of contract against [the Insurers].
“11. In combination, the verdicts of the Phase I and the Phase II juries constitute a full and complete adjudication of one of [Sonat’s] claims for relief, i.e., [Sonat’s] claim for declaratory relief and breach of contract re *64 lating to the entire PCB remediation project at all of [Sonat’s] compressor stations. Therefore, the judgment is certified as final pursuant to Rule 54(b), there being no cause for delay, as the PCB Remediation Program constitutes a single claim for relief, which has been completely disposed of, and entry of judgment should be final.”
The Insurers filed a timely post-judgment motion under Rule 50, Ala. R. Civ. P., or, in the alternative, under Rule 59, Ala. R. Civ. P. The trial court denied that motion on August 14, 2008, and the Insurers timely appealed on September 23, 2008 (appeal no. 1071770).
In their appeal to this Court, the Insurers moved on October 10, 2008, for an expedited jurisdictional determination regarding the propriety of the trial court’s certification of the April 24, 2008, order as a final judgment under Rule 54(b), Ala. R. Civ. P. Both the Insurers and Sonat submitted briefs and supporting materials regarding the Insurers’ motion.
On February 20, 2009, this Court entered the following order, which was directed to the trial court:
“In consideration of the [Insurers’] motion for expedited jurisdictional determination, it appears that the trial court’s order [entered on April 24], 2008, is not properly certifiable as a final judgment without an apportionment, among the underwriters, of the damages awarded.
“IT IS, THEREFORE, ORDERED that this cause is remanded for your consideration of apportioning damages among the defendant underwriters.
“If you elect to enter a final judgment including an apportionment of damages, a supplemental record reflecting such action should be prepared and forwarded to this Court within twenty-one (21) days from the date of this order. The judgment will be considered to be final as of the date the new order is entered.”
On March 12, 2009, the trial court entered an order apportioning the total award among 28 subscribers to the policies at issue. On March 25, 2009, the Insurers filed a notice of appeal as to the trial court’s order of apportionment of the damages award. This appeal was docketed as case no. 1080816. By order of this Court, case no. 1080816 was consolidated with case no. 1071770 on April 7, 2009.
Meanwhile, the parties were preparing in the trial court for the Phase III trial of issues related to Sonat’s remediation efforts at its mercury-metering stations. Although on December 17, 2008, the trial court had stayed the Phase III trial pending the outcome of appeal no. 1071770, the trial court, in orders entered on June 10 and June 12, 2009, denied the Insurers’ motions to stay discovery as to the issues involved in the Phase III trial.
On June 24, 2009, the Insurers filed a motion in these consolidated appeals, asking this Court to stay discovery in the trial court as to the Phase III trial.[6] In an *65 order dated July 27, 2009, this Court denied that motion.

Discussion

As noted above, this Court in its initial consideration of the Insurers’ motion for an expedited jurisdictional determination remanded the case for the trial court to apportion damages among the various subscribers to the policies at issue in the Phase II trial; on remand the trial court entered an order apportioning the damages. Nonetheless, in addition to raising several issues in their briefs to this Court as to the merits, the Insurers reiterate their contention that the “judgment” rendered after the Phase II trial should not have been certified as a final judgment under Rule 54(b), Ala. R. Civ. P. We agree with the Insurers and therefore dismiss the appeals.
Rule 54(b), Ala. R. Civ. P., states, in relevant part:
“When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.”
In reviewing a judgment entered under Rule 54(b), this Court reviews de novo “[wjhether the action involves separate claims and whether there is a final decision as to at least one of the claims.” Scrushy v. Tucker, 955 So.2d 988, 996 (Ala. 2006).[7] In Scrushy, this Court included the following discussion regarding the determination of whether a judgment under Rule 54(b) involves a separate and distinct claim for relief that has been fully adjudicated:
“In Precision American Corp. v. Leasing Service Corp., 505 So.2d 380, 381 (Ala.1987), this Court recognized the difficulty of the question before us.
“ ‘The question before this Court is whether the partial summary judgment LSC received completely disposed of a claim so as to make that judgment final. Rule 54(b) does not authorize the entry of final judgment on part of a single claim. Tolson v. United States, 732 F.2d 998, 999 (D.C.Cir.1984). Neither federal nor state courts have been able to settle on a single test to determine when claims are separate or exactly what constitutes a claim. See, Tolson, 732 F.2d at 1001; Cates v. Bush, 293 Ala. 535, 307 So.2d 6 (1975). However, authorities have stated that “when plaintiff is suing to vindicate one legal right and alleges several elements of damage, only one claim is presented *66 and subdivision (b) [of rule 54] does not apply.” 10 C. Wright, A. Miller, and M. Kane, Federal Practice and Procedure: Civil 2d, § 2657, at 69-71 (1983); Landry v. G.B.A., 762 F.2d 462, 464 (5th Cir.1985).’
“Federal authorities have also recognized that the ‘separate claim’ question is not easily resolved. For example, the Fifth Circuit stated in Samaad [v. City of Dallas, 940 F.2d 925, 930 (5th Cir. 1991)]:
“ ‘Even if we are able to differentiate nicely between the legal and discretionary aspects of rule 54(b) judgments, a great deal of uncertainty nonetheless remains, for we must consider the unsettled question of what exactly is a ‘claim for relief.’ The most that can be said confidently about this question is that various eourts focus upon different things but are reluctant to articulate hard-and-fast tests.
“ ‘Some courts concentrate on the facts underlying the putatively separate claims. For instance, in Jack Walters & Sons [v. Morton Bldg.], 737 F.2d [698] at 702 [ (7th Cir.1984) ], the court sought to define “claim for relief’ in light of what it deemed to be rule 54(b)’s purpose: “to spare the court of appeals from having to keep relearning the facts of a case on successive appeals.” Accordingly, it held that “if the facts underlying different claims are different, the claims are separate for Rule 54(b) purposes.” Id.
“ ‘Similarly, in Purdy Mobile Homes [v. Champion Home Builders Co.], 594 F.2d [1313] at 1316 [(9th Cir.1979) ], the court rejected an argument that there was only one claim because some facts were common to all the theories of recovery. The fact that one claim required proof of facts different from those required to prove another claim rendered it “separate.” Id. See also Gas-A-Car[ Inc. v. American Petrofina, Inc.], 484 F.2d [1102] at 1105 [(10th Cir.1973)]; 6 [James W.] Moore et al., [Moore’s Federal Practice ], ¶ 54.33[2] at 54-194 [ (2d ed.1991) ].
“ ‘Other courts have rejected this fact-bound test and have focused upon the possibility of separate recoveries under arguably separate claims. They have developed what one commentator has labeled a “legal rights test,” under which common underlying facts do not preclude the existence of similar claims. 6 Moore et al., supra, ¶ 54.33[2] at 54-196 n. 31 (discussing Tolson [v. United States, 732 F.2d 998 (D.C.Cir.1984) ]).
“ ‘Nonetheless, certain points of agreement emerge from the cases. For instance, “[i]t is clear that a claimant who presents a number of alternative legal theories, but whose recovery is limited to only one of them, has only a single claim of relief for purposes of Rule 54(b).” Page [v. Preisser], 585 F.2d [336] at 339 [ (8th Cir.1978) ] (citing Edney v. Fidelity & Guar. Life Ins. Co., 348 F.2d 136, 138 (8th Cir.1965)). Although courts generally agree on these points, they do not fully reveal the contours of the phrase “claim for relief.” And we are reluctant, at least in this case, to rush in where other courts fear to tread. Like them, rather than attempting to formulate a generally applicable definition, we take note of the foregoing “rules of thumb” and decide the case at hand.’
“940 F.2d at 930-32 (footnotes omitted). The Seventh Circuit employed similar reasoning in Steams [v. Consolidated *67 Management, Inc., 747 F.2d 1105 (7th Cir.1984) ]:
“ ‘Unfortunately, there is no clear test to determine when claims are separate for purposes of the rule. Local P-171 [Amalgamated Meat Cutters v. Thompson Farms Co.], 642 F.2d [1065] at 1070 [ (7th Cir.1981) ]. Nonetheless, we have recognized certain rules of thumb to identify those types of claims that can never be considered separate, and have examined the remainder on a case-by-case basis. The first rule is that “claims cannot be separate unless separate recovery is possible on each.... Hence, mere variations of legal theory do not constitute separate claims.” 642 F.2d at 1071. The second is that “claims so closely related that they would fall afoul of the rule against splitting claims if brought separately” may not be considered as separate. Id.’
“747 F.2d at 1108-09.
“The United States Court of Appeals for the Second Circuit enunciated the following test in Rieser v. Baltimore & Ohio R.R., 224 F.2d 198, 199 (2d Cir. 1955), that the commentators in Federal Practice & Procedure find workable: ‘The ultimate determination of multiplicity of claims must rest in every case on whether the underlying factual bases for recovery state a number of different claims which could have been separately enforced.’ The commentators then state:
“ ‘A single claimant presents multiple claims for relief under the Second Circuit’s formulation when the possible recoveries are more than one in number and not mutually exclusive or, stated another way, when the facts give rise to more than one legal right or cause of action.... However, when a claimant presents a number of legal theories, but will be permitted to recover only on one of them, the bases for recovery are mutually exclusive, or simply presented in the alternative, and plaintiff has only a single claim for relief for purposes of Rule 54(b). Similarly, when plaintiff is suing to vindicate one legal right and alleges several elements of damage, only one claim is presented and subdivision (b) does not apply.’
“10 Charles Alan Wright et al., Federal Practice & Procedure § 2657 (3d ed.1998) (footnotes omitted).
“In his complaint, Tucker alleges the following claims against Scrushy: breach of fiduciary duty by insider trading; breach of fiduciary duty by false accounting and omissions in public disclosures; interested transactions and waste of corporate assets; misappropriation of corporate assets; unjust enrichment; breach of contract; civil conspiracy; willful violation of the law; intentional, reckless, and innocent misrepresentation and suppression; breach of duty of loyalty and good faith; and fraud, misrepresentation, and the breach of the fiduciary duties of loyalty, care, and disclosure. We conclude that the various claims in the complaint are not all variations on a single theme. Scrushy’s alleged breach of duty in accepting bonuses that Health-South was not legally obligated to pay is a sufficiently separate breach that is not alleged elsewhere in the complaint. Therefore, the unjust-enrichment claim is a separate claim that will support a Rule 54(b) certification.
“No substantial issue appears to be presented with reference to the extent to which the financial statements were incorrect. Scrushy does not argue that any of the revised yearly income gain or loss totals are incorrect. As we have *68 previously stated, for purposes of the partial summary judgment appealed here, the trial court assumed ‘that Defendant Scrushy had no actual knowledge of, played no part in and had no active participation in any of the criminal activities that resulted in the falsification and fabrication of the originally filed financial documents that are at issue.’ The facts presented in support of the unjust-enrichment claim appear at this juncture in the proceedings to be straightforward.... The facts underlying the unjust-enrichment claim are sufficiently discrete that the claim can be reviewed separately and apart from the other claims in the complaint. The narrow issues surrounding the bonuses paid to Scrushy are not likely to be presented to us again in the event the remainder of this case is appealed to this Court. See 10 Charles Alan Wright et al., Federal Practice & Procedure § 2659: ‘It is uneconomical for an appellate court to review facts on an appeal following a Rule 54(b) certification that it is likely to be required to consider again when another appeal is brought after the district court renders its decision on the remaining claims or as to the remaining parties.’ ”
Scrushy, 955 So.2d at 996-99 (emphasis added).
As noted above, in Lloyd’s I it was not necessary to “decide whether there is simply one claim for relief asserted in Sonat’s complaint, or whether recognition for some separate claims could be justified, as for example, with respect to mercury contamination at mercury-metering stations as opposed to PCB [polychlorinated-biphenyl] contamination at compressor stations,” 939 So.2d at 30, because in Lloyd’s I it was clear that, even if there were separate claims for relief, the trial court had not yet disposed of Sonat’s claim for relief as it pertained to all the compressor stations alleged to have suffered polychlorinated-biphenyl (“PCB”) contamination. Lloyd’s I, 939 So.2d at 30. However, Sonat contends that the Phase II trial addressed all the issues surrounding the alleged PCB contamination and remediation at the remaining compressor stations not addressed in the Phase I trial, and, Sonat asserts, the Insurers will face no more liability for damages related to the “PCB remediation project.” Sonat argues, therefore, that all issues related to the “PCB remediation project” present a separate “claim for relief’ that is appropriate for Rule 54(b) consideration and distinct from issues relating to Sonat’s remediation of environmental damages at mercury-metering stations.
More specifically, Sonat contends that its so-called “PCB remediation project” constitutes a single “occurrence” under the terms of the various policies at issue and that all damages related to that “project” therefore present a separate “claim” of breach of contract and a separate “claim for relief’ for purposes of certification under Rule 54(b). Sonat argues that “[t]he only additional liability [the Insurers] face[ ] in this action is based upon a wholly separate single occurrence^] the remediation of mercury contamination along [So-nat’s] pipeline, which is a separate breach of contract, with separate damages.” (So-nat’s brief, p. 53.)
Certainly there is a practical distinction between Sonat’s efforts to clean up the PCB damage at its sites and Sonat’s efforts to clean up the mercury damage at other sites; proving causation and damages at the various sites would turn on the specific facts at each site and might, for example, require testimony from different experts. However, we need not decide in these appeals whether, under the specific facts here, the so-called “PCB-remediation project” and the “mercury-remediation *69 project” are separate “occurrences” under the policies, nor need we decide whether, if those projects are separate “occurrences,” they also are separate breach-of-contract “claims.” Assuming the PCB- and mercury-remediation projects could be said to be separate occurrences and/or claims, the Rule 54(b) certification nevertheless was improper under the circumstances of this case.
In the present case, it is not clear that Sonat has alleged or proved that the Insurers committed separate actions that in turn separately breached its policies of insurance with Sonat as to the so-called PCB-remediation project and the mercury-remediation project.[8] That is, it appears that Sonat is seeking to recover multiple damages relating to their numerous (14,731) sites based on an act or acts by the Insurers that Sonat alleges constitute a single denial of coverage for all Sonat’s claims for environmental-remediation costs.[9] See Lloyd’s I, 939 So.2d at 30 (“As pleaded and presented by Sonat, and as consistently argued by it throughout this litigation, there exists a single claim, expressly predicated on an allegedly ‘single occurrence,’ followed by a single denial of coverage by the Insurers, thereby entitling Sonat to obtain declaratory relief and to recover damages for breach of contract.” (emphasis added)).
It appears very likely that, in the event there is an appeal from a later phase in the underlying action, this Court will be faced with again reviewing facts that are presently before us — e.g., the Insurers’ action or actions that allegedly breached the insurance policies as to “the PCB — remediation project” — to determine if those same facts involve, as to Sonat’s mercury-remediation efforts, a breach of the same policies of insurance at issue here. Additional factual determinations likely to come before us again in a future appeal include issues surrounding Sonat’s notice of its claim under the policies and whether Sonat waived *70 its claims against the Insurers for damages associated with its environmental-remediation efforts. Thus, these appeals stand in contrast to the factual scenario in Scrushy, 955 So.2d at 999, in which it appeared that “[t]he narrow issues surrounding the bonuses paid to Scrushy are not likely to be presented to us again in the event the remainder of this case is appealed to this Court.” Under the unique circumstances here, we think that consideration of an appeal from the underlying action is not appropriate at this time. See Scrushy, 955 So.2d at 999 (“ ‘It is .uneconomical for an appellate court to review facts on an appeal following a Rule 54(b) certification that it is likely to be required to consider again when another appeal is brought after the district court renders its decision on the remaining claims or as to the remaining parties.’” (quoting 10 Charles Alan Wright et al., Federal Practice & Procedure § 2659)). Accordingly, we hold that the trial court erred in certifying the judgment entered after the Phase II trial as final under Rule 54(b), Ala. R. Civ. P., and the appeals are therefore due to be dismissed.[10]

Conclusion

The appeals are dismissed.
1071770 — APPEAL DISMISSED.
1080816 — APPEAL DISMISSED.
COBB, C.J., and LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.

1. As noted in Lloyd’s I, " 'PCB' is an acronym for polychlorinated biphenyl.” 939 So.2d at 32 n. l.

. Rule 21, Ala. R. Civ. P., states, in part: "Any claim against a party may be severed and proceeded with separately."

. The Phase II trial addressed the compressor stations at DeArmanville, Ellerslie, Elmore, Enterprise, Gallion, Louisville, McConnells, Ocmulgee, Onward, Rankin, and Thomaston. The jury found in favor of Sonat as to the sites at Ellerslie, Elmore, Gallion, Louisville, Oc-mulgee, and Onward.

. This order is stamped as “filed in open court on April 8, 2008.” However, the order was not entered in the State Judicial Information System until April 24, 2008. See Rule 58(c), Ala. R. Civ. P. (“An order or a judgment shall be deemed 'entered' within the meaning of these Rules and the Rules of Appellate Procedure as of the actual date of the input of the order or judgment into the State Judicial Information System.”).

5. See supra note 1.

. The Insurers argued that discovery should be stayed “because this Court's decision [in the appeals from the Phase II trial] may greatly alter the landscape in which Phase III will be tried ... [and] also inevitably affect the discovery that must be accomplished in preparation for the Phase III trial.” The Insurers argued that allowing discovery to proceed created a substantial risk that nearly all the discovery would need to be revisited after this Court decides the issues raised in the appeals from the Phase II trials.
Sonat filed an opposition to the Insurers' motion. Sonat argued that the Phase I and Phase II trials resolved the entirety of Sonat's polychlorinated-biphenyl-remediation-project “occurrence” under the subject insurance policies. Sonat asserted that “nothing this Court decides on the current appeal [of the *65 Phase II trial] would eliminate [Sonat's] claim for mercury remediation damages." Sonat argued that the issues in the Phase III trial would require independent, fact-specific inquiries. Additionally, Sonat asserted that although it had objected to a stay of the Phase III trial, Sonat and the Insurers had compromised and had "agreed to a scheduling order that would not stay discovery, but would stay the actual trial, should the appellate decision not be issued by November 2, 2009.” Sonat asserted that the Insurers were "trying, for a third time, to obstruct resolution of [Sonat's] claims by requesting a stay of discovery— discovery it had agreed should go forward six months ago.... [Sonat] is entitled to resolution of all its coverage claims under the [insurance] policies without further obstruction by [the Insurers].”

. In reviewing the trial court’s conclusion as to "[w]hether there was 'no just reason delay,' " we must determine whether the trial court exceeded its discretion. Scrushy, 955 So.2d at 996.

. Indeed, in response to special interrogatories submitted in the Phase I and Phase II trials, the juries in those trials identified a common date — November 13, 1995 — as the date that the Insurers allegedly breached the policies at issue. According to evidence So-nat submitted, the Insurers on November 13, 1995, sent a ''reservation-of-rights” letter to Sonat.

. The Insurers state in their principal brief to this Court:
"Sonat’s complaint did not assert a separate claim for breach of contract regarding the compressor station sites, nor did it attempt to distinguish the damages relating to the 13 compressor stations from the damages at the other categories of sites.”
(The Insurers' brief, p. 67.) Similarly, in their reply brief, the Insurers state:
"Sonat fails to explain how, under Rule 54(b), the judgment fully adjudicated even one of Sonat’s claims. Sonat ignores the fact that the only claim asserted in its pleadings is that [the Insurers] breached their obligations to indemnify Sonat for the costs of its remediation at 14,731 sites. Because Sonat's complaint did not assert a separate claim for the Phase I and Phase II' compressor station sites, Sonat was forced to be creative in its argument that a claim has somehow been resolved here.
"Sonat now argues that the judgment ‘fully and fairly resolved all issues, and provided complete relief, with respect to the PCB Remediation Project occurrence.’ What, respectfully, is a 'PCB Remediation Project occurrence’? It is not a claim in the complaint. The fact that Sonat may have investigated and remediated the damage at its compressor station sites as part of a single project ... has nothing to do with an 'occurrence' or a claim under Rule 54(b).
"The most that can be taken from So-nat's confusing Rule 54(b) argument is that Sonat now believes that the trial court's determination that the damage at the compressor stations amounted to a single occurrence somehow converts such finding into a claim for relief.”
(The Insurers’ reply brief, pp. 31-32.)

. In dismissing the appeals on a procedural basis, we are cognizant of the substantial effort put forth by the parties and of the significant costs involved in prosecuting and defending these appeals. In the event a proper appeal is taken from a future final judgment in the underlying action, one or more parties to such an appeal may move this Court to incorporate the record from these appeals. See, e.g., FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc., 914 So.2d 344, 349 (Ala. 2005) (noting that this Court had, on motion of a party, incorporated the record from a prior appeal).