BOLIN, Justice.
This appeal and cross-appeal result from a multiphase trial involving liability-insurance policies regarding coverage of environmental-remediation costs. On October 15, 2001, Southern Natural Gas Company (“Sonat”) sued Certain Underwriters at Lloyd’s, London, and Certain London Marketing Insurance Companies (hereinafter referred to collectively as “LMI”) alleging that LMI had breached numerous umbrella and excess-liability-insurance policies by failing to pay Sonat for certain environmental-remediation costs. This is the third time this case has come before this Court. See Certain Underwriters at Lloyd’s, London v. Southern Natural Gas Co., 939 So.2d 21 (Ala.2006) (dismissing appeal following Phase I of the trial as not being from a final judgment); Certain Underwriters at Lloyd’s, London v. Southern Natural Gas Co., 41 So.3d 56 (Ala.2009) (dismissing appeals following Phase II of the trial as not being from a final judgment). The trial court entered a summary judgment in favor of LMI during Phase III of the trial, adjudicating all the claims before it. The appeal and the cross-appeal are now properly before this Court.

Facts and Procedural History

Sonat operates a natural-gas pipeline that spans an area from Texas to Georgia. A series of 38 compressor stations are positioned on the pipeline (11 are located in Alabama) in order to maintain the flow of natural gas through the pipeline. So-nat’s integrated pipeline system also includes numerous mercury-metering stations, 131 of which are in Alabama. The integrated pipeline system is controlled from Sonat’s headquarters in Birmingham.
From 1957 to the early 1970s, Sonat employees used the lubricating oil, “Py-draul,” in the air-compressor engines at the compressor stations. In 1989, Sonat learned that Pydraul contained the toxin polychlorinated biphenyl (“PCB”). Environmental testing conducted by Sonat on its own initiative revealed the presence of PCBs at 13 of the 38 compressor stations. Sonat conducted remedial activities at the compressor stations to remove the PCB and to prevent further migration of the PCB into the groundwater.
Sonat also discovered that mercury may have been discharged from mercury-metering stations located along the pipeline. For years, Sonat used manometers or mercury-metering stations along its pipeline to measure the flow of natural gas through its pipeline. The mercury meters were used to determine if there were leaks in the pipeline and to determine customers’ gas usage for billing purposes. Those mercury meters were eventually replaced with newer technology. However, in 1992, the Environmental Protection Agency (“the EPA”) notified other gas-pipeline companies that mercury meters may have leaked. Sonat was notified in 1994 by the Louisiana Department of Environmental Quality that it had begun investigating So-nat’s mercury meters located in Louisiana. In 1994, Sonat conducted remedial activities at hundreds of its mercury stations to prevent further migration of mercury into the groundwater.
*441 LMI had issued umbrella and excess-liability-insurance policies to Sonat from 1949 to 1987. Most of the policies in effect during those years defined an “occurrence” as:
“An accident or a happening, event or a continuous or repeated exposure to conditions which results unexpectedly and unintentionally as applied to the Assured seeking indemnity hereunder, in ... property damage ... during the policy period. All such exposures to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.”
Other policies in effect during those years defined an occurrence as “one happening or series of happenings arising out of or caused by one event taking place during the term of this contract.” All the policies limited coverage to sums Sonat became “legally obligated” to pay “as damages.” The policies barred coverage of claims for damage to property “owned by” Sonat.
On August 28, 1991, and September 8, 1991, Sonat notified LMI of the PCB contamination at the 18 compressor stations.[1] Sonat informed LMI that it was informing all affected underwriters of Sonat’s potential liability with regard to the contamination cleanup costs. On November 2, 1994, Sonat sent LMI notice that the cleanup process was completed.
On November 13, 1995, LMI issued a reservation-of-rights letter to Sonat. In that letter, LMI asked for copies of additional underlying policies from 1959 to 1962, in order to determine coverage for contamination at the compressor sites under the umbrella and excess-liability-insurance policies issued by LMI. LMI reserved its right to deny coverage under the policies issued from 1962 to 1978 for several reasons. LMI also reserved its right to deny coverage in “Whiteshield No. 31” and “Pike County Drum Superfund.”[2]
In 1996, Sonat notified LMI that it would appear from the cost of the cleanup that LMI’s policies would not be impacted. However, Sonat reserved its rights to seek coverage under the policies in the event that Sonat received allegations of third-party property damage or bodily injury. Subsequently, Sonat notified LMI that it would be seeking coverage for its PCB and mercury-remediation programs under the umbrella and excess-liability policies issued by LMI. In July 2001, LMI filed a declaratory-judgment action against Sonat in Georgia, seeking a resolution of the coverage issue. The Georgia action was removed to federal court and was later dismissed.
On October 15, 2001, Sonat filed in the Jefferson Circuit Court a “an action for a declaratory judgment and for breach of contract and anticipatory breach of contract and avoidance of contractual obligations under umbrella and excess liability insurance policies”[3] against LMI. In its complaint, Sonat asserted that the EPA, “other governmental agencies and departments and/or private parties,” including Alabama residents, “have brought or asserted lawsuits, claims, and demands against Sonat alleging property damage, personal injury, bodily injury, and other damage[] and causes of action, including, *442 without limitation, nuisance, trespass, negligence and strict liability, allegedly as a result of Sonat’s operations and ownership” of the natural-gas integrated-pipeline system. Sonat asserted that it has “paid substantial amounts under legal obligation for the remediation of damage in, at, and around the vicinity of compressor stations, and for mercury damage arising from mercury meters.”
Sonat alleged as follows: “Claims, demands and suits have been asserted against Sonat concerning property damage and other damages arising out of Sonat’s integrated operations at compressor stations — including 11 compressor stations located in the State of Alabama. The claimants in the environmental actions, allege, inter alia, damage and other injury based on purported damage including the presence of poly-chlorinated biphenyls and other substances of concern including petroleum-related hydrocarbons, volatile organic chemicals, semi-volatile organic chemicals, polycyclic aromatic hydrocarbons, and various metals, in the groundwater, surface water, air and general environment in, at, around, and in the vicinity of the compressor stations. Claimants seek damages for past and future response costs for alleged property damage and personal injury which is continuous and progressive, beginning in or before 1949 and extending until at least 1986. The monies spent and to be spent in response to demands of a governmental agency, or a private party are ‘damages’ under the Liability Insurance Policies. Alabama Plating Co. v. United States Fidelity and Guar. Co., 690 So.2d 331 (Ala.1997). As such, the Liability Insurance Policies respond to and are required to pay for all damages because of property damage, bodily injury or personal injury (or a combination thereof) which Sonat is or becomes legally obligated to pay as respects the compressor stations. The damages that So-nat has paid or is likely to become legally obligated to pay because of property damage, bodily injury and personal injury arising out of environmental and tort actions concerning Sonat’s compressor stations are within the jurisdictional limits of this Court.
“Claims, demands and suits have been asserted against Sonat concerning property damage and other damage[ ] arising out of Sonat’s integrated operations at mercury metering stations — including 131 mercury metering stations located in the State of Alabama. The claimants in the environmental and tort actions, allege, inter alia, damage and other injury based on purported damage including the presence of mercury in the groundwater, surface water, air and general environment in, at, around, and in the vicinity of the mercury metering stations. Claimants seek damages for past and future response costs for alleged property damage which is continuous and progressive, beginning in or before 1949 and extending until at least 1986. The monies spent and to be spent in response to demands of a governmental agency, or a private party are ‘damages’ under the Liability Insurance Policies. Alabama Plating Co. v. United States Fidelity and Guar. Co., 690 So.2d 331 (Ala.1997). As such, the Liability Insurance Policies respond to and are required to pay for all damage because of property damage, bodily injury or personal injury (or a combination thereof) which Sonat is or becomes legally obligated to pay as respects the mercury metering stations. The damages that Sonat has paid or is likely to become legally obligated to pay because of property damage, bodily injury and personal injury arising out of environmental and
*443 Sonat went on to list in its complaint the location of the affected compressor stations. Sonat’s asserted claims for relief included: (1) that LMI was obligated to pay in full Sonat’s legal liabilities arising out of or in connection with the previously described “environmental and tort actions” and had “failed, or threatened to fail, to fulfill, or acknowledge completely [its] insuring obligations to pay in full Sonat’s legal liabilities”; (2) that there was an actual and justiciable controversy as to LMI’s obligations; (3) that LMI had breached its insuring obligations to Sonat and was obligated to pay Sonat “all direct, indirect, consequential, incidental, special, compensatory and other damages resulting from” the breaches of contract; (4) that LMI’s conduct effected a waiver of its right “to enforce any contractual obligation, limitation, exclusion, or other provisions running in [its] favor” and Sonat was entitled to a judicial declaration to that effect; (5) that LMI had breached its contracts of insurance by “disclosing confidences of Sonat and confidential settlement communications of Sonat in violation of [its] contractual duties to act with good faith and with reasonable care and prudence with regard to [its] insured,” thereby waiving LMI’s “ability to enforce any contractual obligation, limitation, exclusion, or other provision running in [its] favor,” entitling Sonat to a judicial declaration to that effect; and (6) that LMI’s conduct represented an anticipatory breach of contract entitling Sonat to damages. In its concluding “prayer for relief,” Sonat demanded a judgment declaring that LMI was “obligated to pay or reimburse in full Sonat’s cost and expenses for investigation and defense of the environmental and tort actions and to pay or reimburse in full Sonat’s legal liabilities in connection with said environmental and tort actions” and to pay an award for “compensatory damages in an amount or amounts to be determined by the trier of fact at trial, and attorneys’ fees and costs.”
Because of the size and complexity of the case, the parties agreed that the trial should be conducted in phases. The trial court entered an order on October 25, 2002, that the trial be conducted in phases because it would not be possible to try the issues related to all the sites involved in Sonat’s complaint at one trial. The parties proposed to the trial court that two sites be chosen for the initial phase of the trial, one chosen by each party. Sonat chose the compressor station located in Tarrant, and LMI chose the compressor station located in Reform.
LMI filed several summary-judgment motions in Phase I. In one of its motions, LMI argued that the Tarrant and Reform compressor-station sites were separate “occurrences” under the majority of policies, which limited coverage to occurrences at a single-premises location. LMI also argued that no costs at either site would implicate the attachment points of the umbrella and excess policies. LMI also moved for a summary judgment on the ground that the policies do not provide coverage for liability arising out of damage to Sonat’s own property. Additionally, LMI argued that the remediation costs had been voluntarily incurred by Sonat and were not recoverable without third-party compulsion. The trial court concluded that there were genuine issues of material fact remaining and denied the motions.
At the close of the evidence in Phase I, the trial court submitted special interrogatories to the jury, which the jury marked as indicated below:
“INTERROGATORIES: You are hereby directed to answer the following *444 Questions after you have fully considered all the evidence relating to your answers and the applicable rules of law as explained to you by the Court:

“EXISTENCE OF POLICIES:

“Question 1: Did Sonat reasonably satisfy you by the evidence of the existence of each of the following insurance policies?
[[Image here]]
“1. CU 1887 1962-65 X_ Yes
“2. K 11477 1965-68 Yes
“3. CU 10353 1968-71 X_ Yes
“4. K 23900 1971-71 X_ Yes
“5. K 24880 1971-72 X_ Yes
“6. K 25800 1972-75 X_ Yes
“7. UGL 1330 1975-76 Yes
“8. UHL 1370 1976-77 X_ Yes
“9. UJL 1680 1977-78 X Yes
“If your answer to all parts of this Question[] is ‘No,’ stop, have the foreperson sign at the end of this verdict form and Notify the Court.
“If your answer to any part of this Question is Tes,’ proceed to Question No. 2.

“OCCURRENCE:

“Question 2: (A) Did Sonat reasonably satisfy you that there was an ‘occurrence’ under the insurance policies in force from 1962 until 1971?
“An occurrence is defined in those policies as follows:
“ ‘The term “Occurrence” whenever used herein shall mean an accident or a happening, event or a continuous or repeated exposure to conditions which results unexpectedly and unintentionally as applied to the Assured seeking indemnity hereunder, in ... property damage ... during the policy period. All such exposures to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.’
“See Policy Numbers CU 1877; K 11477 and CU 10353
[[Image here]]
“(B) Did Sonat reasonably satisfy you that there was an ‘occurrence’ under the insurance policies in effect from 1971 until 1978?
“An occurrence for these policies means as follows:
“ ‘The word “occurrence” shall be understood to mean ‘one happening or series of happenings’ arising out of or caused by one event taking place during the term of this contract.’ ”
“See Policy Nos. K 23900; K 24880; K 25800; UGL 1330; UHL 1370; UJH 1680
[[Image here]]
“If your answers to all of the parts of this Question are ‘No,’ stop, have the foreperson sign at the end of this verdict form and Notify the Court.
“If your answer to any part of this Question is Tes,’ proceed to Question No. 3.

*445
“LATE NOTICE:

“Question 3:

“(A) Was Sonat’s Notice to LMI of any occurrence at the Tarrant Compression Station late?
[[Image here]]
“(B) Was Sonat’s Notice to LMI of any occurrence at the Reform Compressor Station late?
[[Image here]]
“If your answer to either Question 3(A) or 3(B) is “Yes,’ please proceed to Question 4. If your answer to both Questions 3(A) and 3(B) is ‘No,’ please proceed to Question 5.

“WAIVER:

“Question 5: Did LMI reasonably satisfy you by the evidence that Sonat waived its claim?
[[Image here]]
“If your answer to this Question is Yes,’ stop, have the foreperson sign at the end of the verdict form, and notify the Court. If your answer to this Question is ‘No,’ proceed to Question 6.

“NUMBER/OCCURRENCE (S):

“Question 6: Did Sonat reasonably satisfy you by the evidence that a single occurrence caused the property damage!)] at Tarrant Compressor Station and Reform Compressor Station?
[[Image here]]

“Question 7:

“(A) Are you reasonably satisfied from the evidence that there was damage to property owned by anyone other than Sonat at the Tarrant Compressor Station?
[[Image here]]
“(B) Are you reasonably satisfied from the evidence that there was damage to property owned by anyone other than Sonat the Reform Compressor Station?
[[Image here]]
“If your answer to both Questions 7(A) and 7(B) is ‘No,’ stop, have the foreperson sign at the end of the verdict form, and notify the Court. If your answer to either Question 7(A) or 7(B) is Yes,’ proceed to Question 8.

“TRIGGER:

“Question 8:

“(A) When did any property damage begin at Tarrant Compressor Station?
[[Image here]]
“(B) When did any property damage begin at the Reform Compressor Station?
[[Image here]]
“(C) When did the property damage at the Tarrant Compressor Station end?
[[Image here]]
“(D) When did the property damage at the Reform Compressor Station end?
[[Image here]]

“AS DAMAGES:

“Question 9:

“(A) Were the amounts paid by Sonat at the Tarrant Compressor Station incurred because Sonat was legally obligated to pay them as damages?
[[Image here]]
“(B) Were the amounts paid by Sonat at the Reform Compressor Station incurred because Sonat was legally obligated to pay them as damages?
[[Image here]]
“If your answer to both Questions 9(A) and 9(B) is ‘No,’ stop, have the foreperson sign at the end of the verdict form, and notify the Court. If your answer to either Question 9(A) or 9(B) is Yes,’ please proceed to Question 10.

“EXPECTED AND INTENDED:

*446
“Question 10:

“(A) Do you find that Sonat expected or intended soil contamination at the Tarrant Compressor Station?
[[Image here]]
“(B) Do you find that Sonat expected or intended soil contamination at the Reform Compressor Station?
[[Image here]]
“If your answer to both Questions 10(A) and 10(B) is ‘Yes,’ stop, have the foreperson sign at the end of the verdict form, and notify the Court. If your answer to either Question 10(A) or 10(B) is ‘No,’ please proceed to Question 11.

“BREACH OF CONTRACT:

“Question 11: Did LMI breach the contracts?
[[Image here]]
“If your answer to this Question is ‘No,’ have the foreperson sign at the end of this verdict form and notify the Court. If your answer to this Question is Tes,’ then what is the date when the breach occurred?
Month Nov Day 13 Year 1996

“QUANTUM/COSTS:

“Question 12: Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the Tarrant Compressor Station Site.
“Four Million Three Hundred Ninety Two Thousand Nine Hundred Fifty Eight and 87/100
“($4,392,958.87)
“Question 13: Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the Reform Compressor Station Site.
“Five Hundred Twelve Thousand Eight Hundred Eighty Four and 57/100
“($512,884.57)

“ATTACHMENT POINTS:

“Question 11: Are policies CU 1887 (in effect between 1962-65), K 11477 (in effect between 1965-68), and CU 10353 (in effect between 1968-71), excess of $1,050,000.00 in limits of underlying insurance or $50,000.00 in underlying insurance?
“_$1,050,000.00 X $50,000
Based on the jury’s answers to the interrogatories, the trial court entered an order making a pro rata allocation of the loss based on each policy year’s share of the loss. The trial court determined that LMI owed Sonat $974,277. The trial court purported to make its order final pursuant to Rule 54(b), Ala. R. Civ. P. LMI appealed, and this Court concluded that because there was no adjudication of any single claim in Sonat’s complaint, the trial court had improperly certified the judgment as final. Certain Underwriters of Lloyd’s, London v. Southern Natural Gas Co., 939 So.2d 21 (Ala.2006).
Subsequently, the parties proceeded to Phase II of the case, which involved the remaining 11 compressor stations where PCB had been found and remediated.
*447 The LMI excess-liability policies were the same policies involved in Phase I.
Sonat filed a motion for a summary judgment in Phase II on the ground that there was no genuine issue of material fact with respect to Sonat’s unitary-pipeline operation and that the PCB-cleanup project constituted a single occurrence under the LMI policies based on the jury’s findings in Phase I of the case. The trial court entered the following order:
“This matter is before the court on [Sonat’s] motion for summary judgment on the following:
“1. Insurance Related Findings.
“[LMI] concedes the following:
“(1) Phase I established that LMI insurance policies exist;
“(2) Phase I established (erroneously) the attachment points of the LMI policies;
“(3) Phase I established (erroneously) that Sonat did not waive its claim under the LMI policies.
“[LMI] contests [Sonat’s] motion of the remaining issues.
“This Court finds that the jury made factual determinations which are binding in Phase II on the following:
“(4) The PCB Remediation Program constituted an ‘occurrence’ under the policies;
“(5) The PCB Remediation Expenses incurred by [Sonat] were recoverable;
“(6) [Sonat] provided timely notice to LMI of the PCB Contamination issue.
“The Court finds that there is a jury issue whether LMI breached the contracts with [Sonat].
“2. Single Occurrence.
“[LMI] contends that there was a common cause and, therefore, each site is distinct and separate. However, the trial in Phase I was for two representative sites. The issue presented was whether Pydraul was the common cause of the contamination in the pipeline system. The jury decided it was. Therefore, this court finds that the jury determination that there was a single occurrence is binding on the Phase II trial.
“Therefore, it is Ordered as follows:
“1. The LMI insurance policies exist;
“2. The attachment points are established;
“3. Sonat did not waive its claim;
“4. The Remediation Program was an ‘occurrence’;
“5. The Remediation Expenses are recoverable;
“6. [Sonat] provided timely notice; and
“7. The PCB cleanup was a single occurrence.
“The motion for summary judgment is denied except as provided herein.”
At the close of the evidence in Phase II, the trial court submitted interrogatories for the jury to answer, which the jury answered as indicated:
“Question 1:
“Are you reasonably satisfied from the evidence that, prior to the PCB remediation at the sites, there was dam *448 age to the property of a third party or an imminent threat to third party property, including groundwater and surface water, at the following compressor stations?
“DeArmanville Yes _X_ No
“Ellerslie X _ Yes_No
“Elmore X Yes_No
“Enterprise Yes JK_ No
“Gallion X Yes_No
“Louisville X Yes_No
“McConnells Yes _X_ No
“Ocmulgee X Yes_ No
“Onward X Yes_No
“Rankin Yes _X_ No
“Thomaston Yes X No
“If your answer to this Question as to all Compressor Station Sites is ‘No,’ stop, have the foreperson sign at the end of the verdict form, notify the Court.
“If your answer to this Question as to any Compressor Station Site is Tes,’ please proceed to Question 2.
“Question 2.
“Are you reasonably satisfied that [Sonat] neither expected nor intended property damage at the following Compressor Station Sites?
“DeArmanville X Yes_No
“Ellerslie X Yes No
“Elmore X Yes ¾ o
“Enterprise X Yes ¾ o
“Gallion X Yes ¾ o
“Louisville X Yes ¾ o
“McConnells X Yes_No
“Ocmulgee X Yes_No
“Onward X Yes_No
“Rankin X Yes_No
“Thomaston X Yes No
“If your answer as to all Compressor Station Sites is ‘No,’ stop, have the foreperson sign at the end of the verdict form, notify the Court.
“If your answer as to any Compressor Station Site is Tes,’ please proceed to Question 3.
“Question 3
“Are you reasonably satisfied that LMI breached its contracts with [So-nat]?
“ X Yes No
“If you answered ‘No’ to Question 3, stop, have the foreperson sign at the end of the verdict form, and notify the Court.
“If you answered Tes’ to Question 3, what is the date when the breach occurred?
Month November Day 13 Year 1996
“If you answer ‘Yes’ to Question, 3, then proceed to Question 4.
*449 “Question 4.
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the DeArmanville, Alabama Compressor Station Site:
“Zero DOLLARS
“($0.00)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the El-more, Alabama Compressor Station Site:
“Two Hundred One Thousand Nine Hundred Forty Six and 36/100 DOLLARS
“($201,946.36)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the Gal-lion, Alabama Compressor Station Site:
“Five Hundred Eighty Two Thousand Five Hundred Fifty Four and 63/100 DOLLARS
“(582,554.63)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the McConnells, Alabama Compressor Station Site:
“Zero DOLLARS
“($0.00)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the El-lerslie, Georgia Compressor Station Site:
“One Hundred Sixty Two Thousand Eight Hundred Twenty Eight and 69/100 DOLLARS
“($162,828.69)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the Oc-mulgee, Georgia Compressor Station Site:
“Three Hundred Ninety Four Thousand One Hundred Six and 95/100 DOLLARS
“($394,106.95)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the Tho-maston, Georgia Compressor Station Site:
“Zero DOLLARS
“($0.00)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the Enterprise, Mississippi Compressor Station Site:
“Zero DOLLARS
“($0.00)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the Louisville, Mississippi Compressor Station Site:
“Six Hundred Thirty Nine Thousand Sixty Three and 23/100 DOLLARS
“($639,063.23)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the Onward, Mississippi Compressor Station Site:
*450 “Four Hundred Twenty Two Thousand Three Hundred Five and 74/100
“($422,805.74)
“Please state the total amount, if any, that Sonat is entitled to recover as a result of PCB Contamination at the Rankin, Mississippi Compressor Station Site:
“Zero DOLLARS
“($0.00)
“Question 5.
“What is the amount of interest that [Sonat] is entitled to on its damages? ■ “Two Million Four Hundred Thirty Two One Hundred Ten and 40/100 DOLLARS
“($2,432,110.40)”
Based on the jury’s answers to the special interrogatories, the trial court entered an order finding that, based on its prior orders and answers to the special interrogatories from Phase I and Phase II, (1) the PCB-remediation program constituted an “occurrence” as defined in the policies; (2) the attachment point of the policies for LMI’s excess coverage was $50,000; (3) Sonat was legally obligated to pay for the remediation program and, therefore, Sonat had incurred damage; and (4) the PCB-remediation program constituted a single occurrence under the policies. The trial court concluded that LMI had breached its contracts with Sonat. The court divided the total damages awards from Phase I and Phase II on a pro rata basis and concluded that LMI owed Sonat $2,377,962.45 in damages in Phase II. The court purported to certify the order as final pursuant to Rule 54(b), Ala. R. Civ. P.
LMI appealed. On December 30, 2009, this Court concluded that the order certified pursuant to Rule 54(b) was not a final judgment and, therefore, was not appeal-able because the issue of the mercury contamination was still before the trial court and the same policies issued by LMI were involved in Sonat’s allegations that LMI had breached its contracts in refusing to pay for the cleanup of the PCB-contaminated sites and the sites contaminated with mercury from the mercury-metering stations. Certain Underwriters at Lloyd’s, London v. Southern Natural Gas Co., 41 So.3d 56 (Ala.2009). Accordingly, this Court dismissed the appeal as not being from a final judgment.
The parties proceeded to Phase III regarding the sites contaminated with mercury, Sonat’s cleanup of the mercury-metering stations, and Sonat’s claims that the umbrella and excess-liability policies issued by LMI provided coverage for the environmental cleanup. Both Sonat and LMI moved for a summary judgment. On February 8, 2011, the trial court entered an order, denying both parties’ motions. The parties proceeded with additional discovery.
On September 9, 2011, LMI filed a motion in limine to exclude 171 mercury-contaminated sites that Sonat allegedly had failed to disclose in accordance with a prior discovery order of the trial court in which Sonat had identified 737 mercury-contaminated sites. LMI also sought to exclude 59 sites (of the 737 disclosed sites) because Sonat allegedly had failed to produce documents or reports of the work performed at those sites. LMI also argued that Sonat should not be allowed to present aggregate costs of its mercury remediation. LMI argued that evidence of aggregate costs without site-specific damage figures might confuse the jury because some of the costs related to Sonat’s investigation and remediation of its own property and sites, which were not damaged by mercury contamination. On September 19, 2011, the trial court held a hearing on the motion and subsequently granted the *451 motion. That same day, LMI moved for a partial summary judgment, arguing:
“In prior trial phases of this case, the Court required Sonat to prove the value of the damage and its remediation efforts at each compressor station site. This necessarily required Sonat to prove, not only that each site sustained ‘property damage,’ but also that the amount expended at each location is covered ‘as damages’ under the terms of the LMI policies. Both Phase I and Phase II juries were asked to identify the dollar amount of the covered expenditures at each remediation site. This required the juries to ‘state the total amount, if any, that Sonat is entitled to recover as a result of PCB contamination at’ each individual station. Sonat raised no objection to this requirement. Because some of the sites were owned by Sonat, no amount was awarded to Sonat for contamination at those sites.
“In Phase III discovery, Sonat failed to produce any evidence demonstrating the amount spent on mercury-related activities at any single location. Additionally, in its proposed jury interrogatories, Sonat revealed that it did not intend to prove the costs expended at each individual mercury location. Specifically, the proposed jury interrogatories submitted by Sonat, unlike the interrogatories used in the earlier phases, do not ask the jury to identify the covered damages at each site. Instead, Sonat proposed only that the jury identify a ‘total amount’ of covered damages at all locations ‘along its pipeline operations’ in a single interrogatory. Sonat admitted in open court on September 19, 2011, that is has no ability to prove amounts spent at any one of the 737 mercury sites that Sonat proposed were at issue in the Phase III trial.
“In open court on September 19, 2011, the Court granted LMI’s Motion in Li-mine to Preclude Certain Evidence Regarding Mercury Expenditures. In their motion in limine, LMI argued that Sonat should not be allowed to present invoices and summaries to the Phase III jury because those invoices and summaries are undifferentiated as to any of the sites at issue in Phase III. On the basis of that motion and in light of So-nat’s admitted inability to present any evidence of costs or damages at individual Phase III sites, LMI hereby moves for summary judgment as to all mercury sites placed at issue in Phase III and/or Sonat’s complaint in this action.”
In response to LMI’s summary-judgment motion, Sonat argued that damages do not have to be proven to a mathematical certainty. Sonat also argued that other jurisdictions have allowed proof of aggregate damages.
The trial court granted LMI’s summary-judgment motion. On January 24, 2012, the trial court entered a final judgment based on the prior trials in Phase I and Phase II of the case and based on its partial summary judgment in favor of LMI in Phase III. LMI appeals; Sonat cross-appeals.

LMI’s Appeal (No. 1110698)

LMI argues (1) that environmental contamination occurring at different geographical locations and at different times constituted separate “occurrences”; (2) that none of the policies provide coverage for damage to Sonat’s own property; (3) that the trial court erred in its instruction to the jury regarding imminent threat; (4) that Sonat’s cost for a voluntary remediation of environmental contamination is not recoverable because Sonat neyer became “legally obligated” to pay any sums as “damages”; (5) that the trial court erred in instructing the jury regarding Sonat’s *452 compliance with environmental regulations; (6) that Sonat failed to present substantial evidence that LMI breached its contracts because LMI reserved its rights to challenge its liability; (7) that Sonat failed to present substantial evidence that LMI breached its contracts when Sonat had expressly stated that LMI could close its files on the claims; (8) that the umbrella and excess-liability policies involved had not attached because the damages did not exceed the limits of the underlying insurance; and (9) that the trial court erred in imposing in Phase II findings by the jury in Phase I.
First, we will address LMI’s argument that the trial court erred in applying the jury’s findings in Phase I to the jury in Phase II. LMI complains that the trial court improperly applied the jury’s findings from Phase I — that the PCB contamination was a single occurrence, that the remediation program was the cause of the costs Sonat incurred as damages, and that Sonat gave timely notice of its remediation claim related to the PCB contamination. In support of its argument, LMI cites Black v. Comer, 920 So.2d 1083, 1089-90 (Ala.2005), for the general proposition that the grant of an offensive motion for a summary judgment is proper only when a plaintiff conclusively proves every element of its claim. LMI then goes on to argue that the only issues before the jury in Phase I involved the Tarrant and Reform compressor sites and that the Phase I jury was not presented with any evidence regarding the 11 compressor sites involved in Phase II.
LMI also cites Beacon Theatres, Inc. v. Westover, 859 U.S. 500, 510-11, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), for the proposition that applying the finding from Phase I to Phase II effectively denied LMI its right to trial by jury. Although not noted by LMI, Beacon concerned legal and equitable issues brought in the same action where there were common issues of fact between the two claims so that a court’s resolution of an issue would foreclose relit-igation of that issue before a jury under the doctrine of res judicata or collateral estoppel, and the court in Beacon held that the legal claims must be tried first to ensure that the right to a jury trial of legal issues is not lost.
Rule 42(b), Ala. R. Civ. P., provides:
“The court, in furtherance of convenience, or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by Article 1, Section 11 of the Alabama Constitution of 1901.”
“ ‘Rule 42(b) allows the court to order a separate trial of any claim.... Separate trials usually will result in one judgment....’” Davis v. Hanson Aggregates Southeast, Inc., 952 So.2d 330, 339 (Ala.2006) (quoting 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 2387 (1995)). In short, Rule 42 authorizes the trial court to bifurcate trials in furtherance of convenience or to avoid prejudice or when separate trials will be conducive to expedition and economy.
Here, the parties agreed that it would be inefficient to try the issues related to all 13 compressor-station sites contaminated with PCB at once, and they therefore chose 2 sites to try in Phase I. The trial court cannot be put in error for doing what the parties had agreed to do. Walker v. Southern Trucking Corp., 283 Ala. 551, 219 So.2d 379 (1969). Also, we *453 note that nothing in LMI’s brief indicates that LMI objected to the interrogatories posed to the jury in Phase I. Failure to timely object to a special interrogatory waives the objection. Wetterhan v. Vesta Ins. Group, Inc., 844 So.2d 568 (Ala.2002); Norfolk So. Ry. v. Bradley, 772 So.2d 1147 (Ala.2000). Furthermore, it is not the duty of the appellate court to search the record for evidence to support an appellant’s contention of error. Roberts v. NASCO Equip. Co., 986 So.2d 879 (Ala. 2007).
LMI now complains that it should not have been bound in Phase II by the answers to the interrogatories given by the jury in Phase I of the trial. However, the factual determinations in Phase I should not be reexamined by a second or subsequent jury because to do so would lead to the unacceptable risk that the jury at each phase would consider evidence differently with possibly inconsistent results. Based on the facts and arguments before us, we cannot say that the trial court erred in applying the facts as found in Phase I to the jury in Phase II. We recognize that following Phase I LMI objected to the trial court’s application of the jury’s findings in Phase I to the Phase II jury. However, LMI had agreed to a multiphased trial, and it had agreed to try the issues related to two compressor-station sites as representative. LMI apparently agreed to, or at least failed to object to, the questions asked of the jury in Phase I. Accordingly, we cannot say that the trial court erred in this regard.
LMI argues that PCB contamination occurring at different compressor stations at different times and by different means of contamination from PCBs amounted to separate “occurrences” under the terms of the policies. “Where an insurance policy defines certain words or phrases a court must defer to the definition provided by the policy.” St. Paul Fire & Marine Ins. Co. v. Christiansen Marine, Inc., 893 So.2d 1124, 1136 (Ala. 2004). The majority of the policies at issue here define an “occurrence” as follows:
“An accident or a happening, event or a continuous or repeated exposure to conditions which results unexpectedly and unintentionally as applied to the Assured seeking indemnity hereunder, in ... property damage ... during the policy period. All such exposures to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.”
The other applicable policies define an “occurrence” as:
“[Ojne happening or series of happenings arising out of or caused by one event taking place during the term of this contract.”
LMI argues that the trial court should have entered a judgment as a matter of law based on the unambiguous definitions of an “occurrence” in the policies. However, in its original brief in this appeal, LMI does not address the definitions contained in the policies. Instead, LMI relies on caselaw from Alabama and other jurisdictions interpreting an “occurrence” and focuses its argument on the cause of the “occurrence.”
It is well settled that,
“[w]hen a trial court is [faced] with a contract issue, it is important for the trial court to determine as soon as practicable the ‘threshold issue’ whether the contract is ambiguous. If the trial court determines that there is no ambiguity, it must ‘ “determine the force and effect of the terms of the contract as a matter of law.” ’ Cherokee Farms, Inc. [v. Fireman’s Fund Ins. Co.], 526 So.2d [871,] 873 [ (Ala.1988) ], quoting Wigington v. *454 Hill-Soberg Co., 396 So.2d 97, 98 (Ala. 1981). However, if the trial court finds the contract to be ambiguous, it ‘must employ established rules of contract construction to resolve the ambiguity.’ Voyager Life Ins. Co. v. Whitson, 703 So.2d 944, 948 (Ala.1997).” If the application of such rules is not sufficient to resolve the ambiguity, factual issues arise:
“‘If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity.’
“Id. at 949. Where factual issues arise, the resolution of the ambiguity becomes a task for the jury. McDonald v. U.S. Die Casting & Dev. Co., 585 So.2d 853 (Ala.1991).”
Alfa Life Ins. Corp. v. Johnson, 822 So.2d 400, 404-05 (Ala.2001).
Without a discussion from LMI of the specific definitions in the policies, we cannot say that the trial court erred in concluding that the policies were ambiguous and that the interpretation of the definitions of “occurrence” in the policies should have been submitted to the jury.
This Court has addressed in other cases the term “occurrence” and whether there had been more than one occurrence. In United States Fire Insurance Co. v. Safeco Insurance Co., 444 So.2d 844, 846 (Ala. 1983), the insurance policy provided that, “[f|or the purpose of determining the limit of the company’s liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.” When called on to look at the definition in that policy, this Court recognized that insurance contracts, like any other contract, must be construed to give effect to the intent of the parties and that, if the terms of the contract are clear and unambiguous, there is no need for judicial construction. The excess insurer in Safeco had argued that the terms “substantially” and “general” were ambiguous. The Court did not find those terms to be ambiguous and construed them in accordance with their common meaning and import.
In Safeco, water had leaked through the roof of a building, damaging the merchandise of the lessee occupying the building. Subsequently, the lessee incurred additional damage by rainfall when the roofing crew repairing the roof failed to effectively cover a portion of the roof on which it was working. The excess insurer argued that these instances were two occurrences because some of the damage resulted from negligent acts of the roofing crew. The Court determined that the issue was whether the definition of the term “occurrence” in the policy involved the question whether “substantially the same general conditions,” 444 So.2d at 846, existed at the time of the damage. The Court recognized that the definition of “occurrence” in the policy contemplated that one occurrence may have multiple and disparate impacts on individuals and that injuries may extend over time. The Court went on to address the question whether the damage stemmed from one proximate cause and concluded that there was a separate intervening cause because the initial water leaking through cracks in a roof and the subsequent negligent act of a roofing crew in failing to effectively cover a portion of the roof so that further damage resulted during additional rains were two separate occurrences. “[I]f the cause is interrupted or replaced by another cause, the chain of causation is broken and more than one accident or occurrence has taken *455 place.” Safeco, 444 So.2d at 847. The Court recognized that a majority of courts have recognized the “cause” theory rather than looking to the number of claimants or injuries.[4] In short, a separate, intervening cause can break the chain of causation so that there is more than one “occurrence.”
In Home Indemnity Co. v. Anders, 459 So.2d 836 (Ala.1984), the City of Mobile sought a judgment declaring its liability under § 11-93-2, Ala.Code 1975 (limiting recovery of damages against governmental entities), to numerous flood victims who had pending against the City actions seeking compensation for property damage. Because there was no definition of “occurrence” in the statute, this Court stated:
“We recently had occasion to define the phrase ‘one occurrence.’ United States Fire Insurance Co. v. Safeco Insurance Co., 444 So.2d 844 (Ala.1983). We concluded that ‘as long as the injuries stem from one proximate cause there is a single occurrence.’ Id. at 846 (quoting Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 61 (3rd Cir. 1982)). While in Safeco we were attempting to give effect to the intention of the parties to the insurance contract and here we are trying to give effect to the intention of the Legislature, we find that difference to be of no consequence, since in both situations the drafting parties were attempting to accomplish the same objective. They sought to limit liability by limiting recoveries for injuries that result from a common source.”
459 So.2d at 843.
In St. Paul Fire & Marine Insurance Co. v. Christiansen Marine, Inc., 893 So.2d 1124 (Ala.2004), this Court was asked to determine the deductible applicable to a towing company’s claims against the buyer of seven barges where one barge began taking on water causing the tow to break apart. The marine-insurance policy did not define “accident” or “occurrence” so this Court looked to Black’s Law Dictionary to define those terms and to Safeco, supra, for guidance in determining whether there had been one accident, event, or continuing condition that resulted in property damage that was neither expected nor intended by the barge owner. The Court stated:
“In this case, [the barge owner’s] barges were not operating separately and were not involved in separate incidents; they were all bound together and under the control of the same two tugboats. Although the exact cause of the loss has not been identified, the record reflects that one or more of [the barge owner’s] barges took on water while being towed and that this event caused the entire tow to break apart. [The towing company] sustained damage as a result. The fact that all seven barges were involved in the incident giving rise to [the towing company’s] damage does not establish that there were seven ‘occurrences,’ for purposes of calculating the deductible due under the policy. Moreover, [the insurer] has not offered any evidence to establish that [the towing company’s] damage resulted from more than one proximate cause or that another cause intervened to break the chain of causation created by [the towing company’s] tow taking on water.”
893 So.2d at 1137.
In the present case, Sonat presented testimony during Phase I that it operated an integrated pipeline as a part of which the compressor stations worked in unison *456 to move natural gas though the pipeline. Sonat presented ■ testimony that Pydraul was used to lubricate the engines at the compressor stations and that Pydraul was the only material containing PCBs used at the compressor stations. Sonat presented testimony that Pydraul had leaked through the seals in the air-compressor cylinders and had mixed with moisture in the stream of compressed air and that PCBs from the Pydraul thereby had seeped into the soil and groundwater.
LMI contends that some of the compressor sites were contaminated in different ways and that, because the contamination was caused by different acts or omissions, there was no common chain of causation at all the sites and, therefore, there was more than one occurrence. LMI cites testimony from Phase II of the trial that indicated that contamination had occurred at different places at each compressor station. LMI refers to testimony from Phase II of the trial, indicating, for example, that contamination at one site had resulted from employees’ washing rags contaminated with PCBs or throwing rags contaminated with PCBs into a burn pit after those rags had been used to lubricate the compressor stations. We note that the jury in Phase I found that Sonat proved that there had been an “occurrence” as that term was defined in the applicable policies and that the jury in Phase II was bound by that finding. The jury in Phase I found that there had been one “occurrence” under the applicable policies. The jury in Phase II answered the questions whether there was a threat of contamination to a third party’s property and whether the PCB contamination was expected or intended at the remaining 11 compressor stations. Even if we limit our discussion to evidence presented at Phase II as LMI has done, LMI still has not shown that there was more than one occurrence. The testimony from Phase II from a retired Sonat engineer explains how Py-draul was used in lubricating the compressor stations:
“Q: In the utilization of the air compressor in that system and that storage tank, do you ever have occasion to have some of the lubricant actually end up in the air system?
“A: Yes. You’re lubricating the walls of a reciprocating compressor and this compressor has got rings on it just like rings on a car, so with wear and with time, you’re going to get some oil carryover into the air system. It’s just a normal part of the operation is to get some carryover, just like you get some oil carryover in the rings of a piston on a car engine and therefore have to replenish the oil from time to time.
“Q: I may have asked you this, if I have I apologize. Do you also get water vapor or water condensate that builds up in the storage or receiver tank for these air compressor systems?
“A: Especially, with the humidity that we have here in the south, when you take air at atmospheric pressure and compress it, then there’s water squeezed out basically. The air is not capable of holding as much moisture in a vapor form at two hundred and fifty PSI as it is at atmospheric pressure. So yes, you would have some free water that would drop out typically in the air receivers and it was common practice just to drain that water out of that receiver once a day so it didn’t take up space that could be occupied by the compressed air.
“Q: What do you mean it was common procedures to drain that water out? Explain that for us.
“A: Well, you would have a valve in the bottom of the air receiver, again, just like you would have in the bottom of an air compressor that you went to *457 Lowe’s and picked up today, there’s a little drain cock in the bottom of those tanks and it’s to drain the water off that’s going to accumulate in that tank to keep it from occupying space and also to keep it from creating a corrosion problem in the bottom of the vessel. These are steel tanks that the air was stored in so any liquids that was in there would over time cause some corrosion problems if you weren’t draining that out on a daily basis.
“Q: I understand that in the mid to late ’80s that your procedures changed a little bit, but before that time, was it the practice to remove the condensate by opening the blowdown valve and letting it go to the ground?
“A: Yes. It was typically just water. Like I said, occasionally there would be a little oil in that that had carried over into the tank, but essentially, it was water that was being blown out and it was a routine part of an operator’s day is to go by the tank, the air receivers periodically and open the valve and blow it until there was nothing but air coming out and close the valve back off.”
LMI’s own expert testified that all compressors have to be “blown down” and that doing so is part of the routine operation of the compressor. Sonat’s early practice was to discharge the condensate blowdown onto the ground. Part of the air-compressor-station operator’s routine is wiping off the machines and cleaning up the rags used in the blowdown process. The operator would open the valve and discharge the condensate, and the water containing Py-draul would go into the ground. The operator would take the rags used in this process and wash them and then the water they were washed in, which contained Py-draul, would go into the ground at that location.
Based on the arguments before us, we cannot say that there was a separate intervening cause. Sonat had cleanup areas at each site where Pydraul (and the PCBs in that lubricant) had contaminated the groundwater; that contamination was caused by the use of Pydraul through a unitary pipeline, and the manner of operating each compressor station was the same. In Safeco, the excess insurer was not liable under its policy for the additional damage to the lessee that resulted from the intervening cause of the roofing company’s not covering the roof where it was performing the repairs. In the present case, some compressor stations exhibited PCB at different places. In Safeco, we recognized that the definition of “occurrence” in that policy contemplated that one occurrence may have multiple and disparate impacts on individuals and that injuries may extend over time. Accordingly, we cannot say that LMI has shown that the trial court erred in finding that there had been one “occurrence.”
Next, LMI argues that none of the policies provide coverage for damage to Sonat’s own property, including the PCB-contaminated groundwater on So-nat’s property. The policies bar coverage of “any claim ... brought by the named Assured for damages to or destruction of its property,” and other applicable policies bar coverage of “property owned by the named insured.... ” LMI argues that the policies exclude coverage of Sonat’s costs to clean up the contaminated groundwater that had not migrated from Sonat’s own property.
In Alabama Plating Co. v. United States Fidelity & Guaranty Co., 690 So.2d 331 (Ala.1996), this Court addressed the insurer’s argument that the costs of performing environmental remediation ordered by the Alabama Department of Environmental Management are *458 not “damages” under a comprehensive-general liability (“CGL”) policy and that the “owned-property” exclusion in its CGL policy precluded coverage for cleanup of water or soil within the boundaries of an insured’s property. We stated:
“This Court has not previously addressed these specific issues, and the relevant terms are not defined in the CGL policies at issue. However, as noted previously, the policies in question are standard-form policies issued nationwide, so the rulings of courts in other states are of some guidance. We find that as to each issue above, the clear majority of courts that have answered the questions have ruled against the arguments made by USF & G. Thus, we adopt the majority position on each issue: environmental remediation costs are damages covered by CGL policies, and the ‘owned property’ exclusion does not exclude coverage for the costs of remediating groundwater contamination. These rulings are consistent with prior decisions of this Court. We have previously refused to narrowly limit the type of costs covered as damages under a liability policy. National Union Fire Ins. Co. v. City of Leeds, 530 So.2d 205 (Ala.1988). We have also held that a landowner’s interest in the groundwater beneath his property is a limited right, see Martin v. City of Linden, 667 So.2d 732 (Ala.1995), not one of ownership.”
690 So.2d at 336-37 (footnotes omitted).
In support of our holding in Alabama Plating that the owned-property exclusion does not preclude coverage for the costs of remediating groundwater contamination, we cited numerous cases addressing groundwater spread. In Claussen v. Aetna Casualty & Surety Co., 754 F.Supp. 1576 (S.D.Ga.1990), Aetna’s insurance policy did not cover claims based solely on damage to its insured’s property. According to Aetna, the pollution discharge from the property damaged only the groundwater beneath the insured’s own land, and Aetna asserted that under Georgia law a property owner owns all that is below and above his property. Accordingly, Aetna argued that the environmental disaster at the site damaged only the insured’s own property and that Aetna was not liable. The Georgia court held that Aetna’s argument failed for three reasons. First, under controlling law, the insured did not own the groundwater under the insured’s land. Thus, the owned-property exclusion did not bar coverage for any damage to the groundwater. Second, the toxic dumping damaged not only the insured’s land, but also surrounding land and water. Third, the EPA had required the insured to clean up the site to prevent damage to third person’s property as well as to the insured’s own property.
In Upjohn Co. v. New Hampshire Insurance Co., 178 Mich.App. 706, 444 N.W.2d 813 (1989), rev’d on other grounds, 438 Mich. 197, 476 N.W.2d 392 (1991), the insured discovered contamination and cleaned up its own subsoil as contaminants were slowly making their way into the groundwater. The Court of Appeals of Michigan noted:
“[W]e agree with the trial court that governmental agencies could have ordered Upjohn to act and, had they done so, Upjohn would have been legally obligated to pay the cost of cleanup.... We note that the improper release of toxic wastes may cause property damage not only to the actual owner of the land, but also the government because of its independent interest, behind the titles of its citizens, in all the air and earth (i.e., its natural resources) within its domain. We believe that it makes no difference that Upjohn took the remedial action it did before being ordered to do so, and, *459 in fact, we believe that such swift remedial action should be encouraged, rather than discouraged.”
178 Mich.App. at 719-20, 444 N.W.2d at 819 (internal citations omitted).
In Northern States Power Co. v. Fidelity & Casualty Co. of New York, 504 N.W.2d 240 (Minn.Ct.App.1993), affd, 523 N.W.2d 657 (Minn.1994), the Court of Appeals of Minnesota rejected an insurer’s argument that certain environmental cleanup costs were excluded from coverage by an owned-property exclusion. The insurer argued that it did not have to pay for removal of contaminated soil from its insured’s property because no money had been spent to remedy the contamination of the groundwater but only to excavate and remove contaminated soil. The court held that “because groundwater pollution has occurred, the ‘own property’ exclusion does not bar coverage for cleanup expenses needed to correct already existing soil contamination which continues to damage the groundwater.” 504 N.W.2d at 246.
This Court in Alabama Plating also cited Patz v. St. Paul Fire & Marine Insurance Co., 817 F.Supp. 781 (E.D.Wis.1993), in which the insured argued that the owned-property exclusion did not bar coverage of the costs of preventing future harm to groundwater or adjacent property that might arise from contamination that has already taken place, whether such contamination had occurred on the insured’s property or on the property of others.
In the present case, testimony presented at Phase I and Phase II showed that the soil and groundwater on Sonat’s property were' contaminated with PCBs. Additionally, testimony from both phases indicated an imminent threat to third parties’ property based on the levels of PCBs found both in the soil and sediment, the movement of PCBs in the environment, and the toxic nature of PCBs. Moreover, there was testimony indicating that the PCB contamination at several of the compressor stations had already migrated from Sonat’s property.
In conjunction with its argument that the owned-property exclusion did not provide coverage for remediation of Sonat’s property, LMI argues that the trial court erred in instructing the jury, over its objection, as follows:
“[W]ith regard to the own property question ... an insured may recover, notwithstanding the own property exclusion, where the remediation was the result of imminent threat of harm to third parties or third party property.”
In Arthur v. Bolen, 41 So.3d 745, 749 (Ala.2010), this Court stated:
“ ‘A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case.’ Pressley v. State, 770 So.2d 115, 139 (Ala.Crim.App.1999). Thus, ‘generally speaking, the standard of review for jury instructions is abuse of discretion.’ Pollock v. CCC Invs. I, LLC, 933 So.2d 572, 574 (Fla.Dist.Ct.App.2006).”
This Court has also stated:
“Under Alabama law, ‘ “[a] party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis for the granting of a new trial.” ’ King v. W.A. Brown & Sons, Inc., 585 So.2d 10, 12 (Ala.1991) (citation omitted). When an objection to a jury charge has been properly preserved for review on appeal, as this one was, we ‘ “look to the entirety of the [jury] charge to see if there was reversible error,” ’ and reversal is warranted only if the error is prejudicial. King, 585 So.2d at 12.”
*460 George H. Lanier Mem’l Hosp. v. Andrews, 809 So.2d 802, 806 (Ala.2001).
In the present case, the trial court’s instruction is a correct statement of the law as stated in Alabama Plating: The owned-property exclusion does not bar coverage for the costs of remediating groundwater contamination. We recognize, as did the Court in Alabama Plating, that a landowner’s interest in the groundwater beneath the landowner’s property is a limited right and not one of ownership. Accordingly, on-site soil cleanup is not barred by an owned-property exclusion where there is a threat that the contaminants in the soil on the insured’s property will migrate to groundwater or to the property of others.
Next, LMI argues that Sonat’s costs for its voluntary remediation of the PCB contamination were not recoverable under the terms of the policies. Specifically, LMI argues that Sonat’s cleanup costs were not “damages” that it was legally obligated to pay because the PCB-remediation project was an internal business decision and not the result of any compulsory process by a court or a state or federal agency.
The applicable policies required LMI to “indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability (a) imposed upon the Assured by law, (b) assumed under contract or agreement by the Named Assured ... for damages, direct or consequential and expenses ... on account of ... Property damage ... used by or arising out of each occurrence happening anywhere in the world.”
LMI does not cite a definition of “damages” in its policies; instead, it refers to the definition of damages found in Jenelle Mims Marsh & Charles W. Gamble, Alabama Law of Damages § 1.1 (5th ed.2004): “[A] pecuniary compensation or indemnity which may be recovered in the courts by any person who has suffered loss ... through the unlawful act, omission, or negligence of another.” We note that if a word or phrase is not defined in an insurance policy, then a court construing the policy should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it. Lambert v. Coregis Ins. Co., 950 So.2d 1156 (Ala.2006).
In Alabama Plating, 690 So.2d at 336, besides addressing the issue whether an owned-property exclusion barred recovery of the costs to clean up the groundwater, this Court addressed the question whether environmental-remediation costs were “damages” covered by the CGL policies. The CGL policies provided that they covered all sums the insured was “‘legally obligated to pay as damages.’ ” 690 So.2d at 333. This Court adopted the majority position that environmental-remediation costs were damages the insured was legally obligated to pay.
In support of our holding in Alabama Plating, we cited numerous cases from other jurisdictions, including Bausch & Lomb Inc. v. Utica Mutual Insurance Co., 330 Md. 758, 625 A.2d 1021 (1993). In Bausch & Lomb, relevant environmental statutes imposed strict liability upon the insureds to clean up their polluted properties. Although the state had not filed an administrative proceeding, it had listed the insured’s property on a list of hazardous sites and later conducted an investigation. The insured cleaned up the site before any action was filed. The Maryland Court took the position that “response costs, undertaken in the regulatory context, represented a sum the corporation was legally obligated to pay” because the “tacit threat of formal State intervention was ... al *461 ways present.” 330 Md. at 780, 625 A.2d at 1032.
We also cited Atlantic Wood Industries, Inc. v. Lumbermen’s Underwriting Alliance, 196 Ga.App. 503, 396 S.E.2d 541 (1990), in which the term “damages” in the policy was not being used in its legal and technical sense, and the court held that it was a term susceptible of more than one definition.
“‘Clearly there is a specific, technical definition for the word [“damages”]: “payments to third persons when those persons have a legal claim for damages.” [Cit.] If the insurer intended that “damages” have only this meaning, it should have so indicated in the policy. The insured would then have understood that cleanup costs incurred pursuant to government mandate were not covered, and would have been able to enter into other insuring agreements. Because such a limiting definition was not included in the policy, we must conclude that the parties did not intend “damages” to have a specific technical meaning in the insurance policy. Rather, they intended to use its ordinary meaning.’ ”
196 Ga.App. at 505, 396 S.E.2d at 543 (quoting C.D. Spangler Constr. Co. v. Industrial Crankshaft, Etc. Co., 326 N.C. 133,151, 388 S.E.2d 557, 568 (1990)).
Although not cited in Alabama Plating, we believe Weyerhaeuser Co. v. Aetna Casualty & Surety Co., 123 Wash.2d 891, 874 P.2d 142 (1994), conveys the reason remedial cleanup begun prior to governmental action or the actual filing of a lawsuit should be treated the same as cleanup performed as a result of governmental action or judicial direction. In Weyerhaeu-ser, the policy provided coverage when the policyholder’s legal obligation to pay was “imposed by law.” The insured argued that its liability was imposed by law by its liability under pollution statutes and that it did not need to await the overt threat of suit before cleaning up pollution damage. The Supreme Court of Washington recognized that “[insurance coverage in the environmental claims area may be quite different than in other insurance settings. Environmental statutes impose liability, often without fault, on polluters in order to safeguard society in general.” 123 Wash.2d at 909, 874 P.2d at 152. The court stated:
*462 123 Wash.2d at 910, 874 P.2d at 152-53 (footnote omitted). The court concluded that liabilities imposed by law can reasonably be read to encompass remedial actions taken at hazardous-waste sites before liability to a third party is fixed.
Sonat presented testimony in Phase I of the case that the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., required Sonat to report PCB contamination to the EPA. Sonat presented testimony regarding the general way the EPA handled PCB contamination and remediation programs and testimony that Sonat was on a list of companies against which the EPA would pursue enforcement actions. Furthermore, Sonat also presented evidence of a consent order issued in Mississippi in which the Mississippi Commission on Environmental Quality had required Sonat to clean up the compressor stations located in Mississippi.
Sonat presented evidence indicating that it had a legal obligation to remediate the PCB contamination at its compressor sites, and we will not limit is damages to those arising out a suit, claim, or action by a third party. Furthermore, in the present case, a third party had required such action. Additionally, in its answer, LMI argued as an affirmative defense that Sonat failed to mitigate, minimize, or avoid some of or all the damage referenced in the complaint. “[Fjorcing a policyholder to both promptly act to mitigate further environmental damage and to await formal threat of legal action creates an unresolvable conflict and results in destroying the contractual right to liability coverage in many cases involving environmental pollution damages.” Weyerhaeuser, 123 Wash.2d at 913, 874 P.2d at 154.
In conjunction with its argument that the policies did not provide coverage for damage Sonat was not legally obligated to pay, LMI argues that he trial court in Phase I erred in instructing the jury as follows:
“An insured is legally obligated for cleanup if it was required to engage in such cleanup activities by law. It is not necessary that anyone actually commenced a lawsuit to compel the cleanup. It is sufficient that a statute or regulation imposed responsibility for such a cleanup.”
As we noted earlier, a trial court has broad discretion in formulating jury instructions, provided the instructions accurately reflect the law. Additionally, reversal is warranted only if the error in the instructions is prejudicial. Here, the trial court’s jury charge regarding damages is in accordance with our holding in Alabama Plating and with the facts of this case as discussed above.
Next, LMI argues that Sonat failed to present substantial evidence that LMI breached its contracts because, it says, LMI simply reserved its rights to challenge its liability. LMI argues that a reservation-of-rights letter does not amount to a breach of contract.
LMI is correct that a reservation of rights allows the insurer to challenge its liability on the underlying claim while still fulfilling its obligations under the policy. Twin City Fire Ins. Co. v. Colonial Life & Accident Ins. Co., 839 So.2d 614 (Ala.2002). In the present case, Sonat presented evidence at Phase I and Phase II indicating that LMI initially received notice of So-nat’s potential claims in 1991. On November 13, 1995, LMI reserved its rights to deny coverage while it decided whether the policies provided coverage. At no time has LMI conducted an investigation into Sonat’s claims. In 1996, Sonat notified LMI that it would appear that LMI’s policies would not be impacted by the PCB-remediation project. However, Sonat re *463 served its rights to seek coverage under the policies. At some point that is unclear in the briefs, the parties began discussing coverage under the policies. In 2001, LMI sued Sonat in Georgia, seeking a judgment declaring whether the policies provided coverage for Sonat’s claims. During Phase I of the case in 2005, a corporate representative for LMI testified that LMI had still not formed an opinion on coverage and was awaiting more information. We note that, in its order denying LMI’s post-judgment motion following Phase I, the trial court concluded that the jury’s findings of LMI’s breaches of contract could properly be based on the evidence indicating that LMI had not acted reasonably in its delay after issuing its reservation-of-rights letter. Under the facts of this case, after being notified in 1991 of the PCB contamination, LMI’s 10-year delay after issuing its reservation-of-rights letter (1995 to 2005) in determining whether to provide coverage under the policies is not reasonable.
LMI argues that Sonat failed to present substantial evidence that LMI breached its contracts when Sonat expressly stated in 1996 that LMI could close its files on the claims. In support of this argument LMI cites only one case for the general proposition that a plaintiff is required to prove that performance is due under a contract and that the defendant faked to perform. Authority supporting only general propositions of law is not a sufficient argument for reversal. Beach-croft Props., LLP v. City of Alabaster, 901 So.2d 703 (Ala.2004). Furthermore, Sonat, in notifying LMI that it could close its files, specifically reserved its right to seek coverage under the policies.
Last, LMI argues that three of the policies had not attached because the remediation costs did not exceed the limits of Sonat’s underlying insurance. Specifically, LMI argues that three of the applicable polices did not reach the attachment points of its umbrella and excess-liability policies because Sonat had not exceeded the limits of the underlying primary policies. LMI argues that the trial court erred in submitting this issue to the jury because it contends that policies CU 1887, K 11477, and CU 10353 were unambiguous. LMI cites a schedule of underlying insurance that it says is similar to the schedules in the three policies. LMI then goes on to discuss only CU 1887.[5] We will likewise limit our discussion to CU 1887.
CU 1887 is an umbrella policy. An umbrella policy is different from an excess-liability policy in that they are meant to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage). Royal Ins. Co. of America v. Thomas, 879 So.2d 1144 (Ala.2003). The schedule provides as follows:
“Schedule of Underlying Insurance “(1) General and Automobile B.I. [bodily injury] & P.D. [property damage] CSL (including $1,000,000 each occurrence Products and Watercraft) excess of the following:
“(A) General Liability (including Products and Watercraft)
*461 “A number of commentators have expressed the concern that the environment will suffer severe harm if owners have to postpone a cleanup until a clear third party claim prompts a lawsuit. One recent text explains that claims for coverage for environmental cleanup arise in three contexts: the insured may be held liable for the costs of cleanup incurred by a third party (typically the federal government or a state); the insured may incur cleanup costs pursuant to administrative order, judicial injunction, or consent decree directing cleanup; or the insured may voluntarily undertake cleanup, possibly in anticipation of incurring one of the forms of liability just described. The author points out that if the three forms of liability were treated differently for insurance coverage purposes, the policyholder would have a strong incentive not to undertake voluntary cleanup which, in turn, would delay cleanup, exacerbate the degree of contamination and increase the ultimate cost of cleanup. He also observed that it would severely impede the ability of the federal and state governments to accomplish cleanup at the thousands of contaminated sites extant. This author notes that most courts (either implicitly or explicitly) have consequently, and he deems correctly, treated all three contexts the same.”
*463 “B.I. $50,000/$100,000/$1,000,000 aggregate products
“P.D. $50,000/$100,000 except special “P.D. C.C.C. $25,000/$100,000 “(B) Automobile Liability “B.I. $100,000/$500,000 “P.D. $50,000”
LMI’s argument is that its policy was not triggered or did not attach until the damage incurred under the underlying *464 policies exceeded $1,050,000. According to LMI, there are two underlying primary insurance policies: one insurance policy attachment point with a $1,000,000 per occurrence limit, and another policy identified in subsection (A) with a $50,000 occurrence limit. LMI contends that the language is unambiguous and, therefore, that the trial court erred as a matter of law and should not have submitted the attachment-point issue to the jury. We disagree.
First, LMI cites only cases concerning general propositions of law regarding ambiguities. “Authority supporting only ‘general propositions of law’ does not constitute a sufficient argument for reversal.” Beachcroft Props., 901 So.2d at 708 (quoting Geisenhoff v. Geisenhoff, 693 So.2d 489, 491 (Ala.Civ.App.1997)). LMI does not discuss the nature of umbrella policies or whether CU 1887 was the main or controlling umbrella policy for the period it was in effect. LMI does not discuss “CSL,” which is in section (1) of the schedule and stands for “combined single limit.” LMI does not discuss “drop-down coverage” in the umbrella policy. LMI does not discuss “split” limits of liability, which are referred to in the schedule with property damage limited to a certain amount and bodily injury limited to a certain amount. It is not the function of this Court to create arguments for an appellant. McLemore v. Fleming, 604 So.2d 353 (Ala.1992). In order to secure a reversal, the appellant has an affirmative duty of showing error upon the record. Tucker v. Nichols, 431 So.2d 1263 (Ala.1983).
Second, in section (1), the schedule references “underlying insurance.” No underlying primary insurer or insurers is referred to by name. Cf. American Res. Ins. Co. v. H & H Stephens Constr. Inc., 939 So.2d 868 (Ala.2006) (discussing coverage under an umbrella policy and the schedule of underlying insurance policies where those policies referred to the underlying primary-insurance carriers by name). The failure to name the primary insurer alone would not create an ambiguity because CU 1887 requires Sonat to maintain insurance, but the schedule does not appear to refer to two primary insurers as LMI argues. Section (1) references combined single limit of coverage in the amount of $1,000,000. The schedule then refers to general liability in subsection (A) and automobile liability in subsection (B). Under subsection (A), the schedule refers to split limits between bodily injury and property damage involving general liability. Subsection (A) refers to property damage “C.C.C.” which stands for property in Sonat’s care, custody, or control but not owned by Sonat and is not applicable here. Subsection (A) refers to property damage of $50,000 for each occurrence and $100,000 where applicable and also is not involved in the present case. The schedule could be interpreted as being triggered by $50,000 in property damage where section (1) refers to a combined single limit of $1,000,000 split between bodily injury and property damage. Tellingly, section (1) has a subsection (1)(A) and (1)(B), and it refers to a combined single limit. CU 1887 was in force from 1962 to 1965, and the underlying insurance referred to in the schedule could be read to refer to a single $1,000,000 that sits over two underlying limits, one of which is the $50,000 in property damage that triggered LMI’s liability. Accordingly, we cannot say, based on the arguments before us, that the trial court erred in concluding that CU 1887 was ambiguous.

Sonat’s Cross-Appeal (No. 1110769)

Sonat argues that the trial court erred in granting LMI’s partial-summary-judgment motion.
*465 “This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989).”
Dow v. Alabama Democratic Party, 897 So.2d 1035,1038-39 (Ala.2004).
During Phase III of the trial, the trial court granted a motion in limine to exclude any reference to mercury sites that had not been disclosed or documents that had not been produced. The trial court also concluded that Sonat should not be allowed to present aggregate costs of its mercury remediation. A trial court has broad discretion in determining whether to grant a motion in limine. Jefferson Cnty. v. Southern Natural Gas Co., 621 So.2d 1282 (Ala.1993).
Sonat argues that the trial court’s requirement that damages for the mercury remediation be proven on a site-by-site basis would likely mislead the jury because such an approach contradicts Sonat’s single-occurrence theory. As discussed earlier regarding the damage arising out the PCB contamination, Sonat presented evidence of its single-occurrence theory where damages at the compressor stations were discussed on a site-by-site basis. This is consistent with our caselaw that damage from a single occurrence may have multiple and disparate impact on individuals and property and that injuries may extend over time. Assuming that the leaking of the mercury meters was a single occurrence, we cannot say that the damage was the same at each site simply because Sonat did not differentiate the costs associated with the cleanup of each site.
Sonat argues that because the mercury remediation was conducted in a uniform manner to address damage caused by the systematic use of mercury at hundreds of the metering stations, it makes sense that contractors would account for its activities by region rather than send several hundred smaller invoices. Sonat cites the transcript from Phase I of the trial for the proposition that it remains prepared to prove costs on a region-by-region basis for the mercury remediation. This testimony regarded Sonat’s ability to look at accounting summaries and determine the specific costs for specific compressor stations regarding the PCB remediation. We cannot say that Sonat should get a second bite at the apple to do the same now.
Sonat cites E.I. du Pont de Nemours & Co. v. Allstate Insurance Co., (Ms. C.A. No. 99C-12-253 JTV, July 31, 2006) (Del.Super.Ct.2006) (not reported in A.2d), for the proposition that overall costs from *466 an occurrence need not be divided or spread when costs were not originally accounted for on that basis, du Pont is distinguishable; it involved excess policies that covered litigation expenses arising out of mass-tort claims and two of the insurers attempted to allocate specific litigation expenses across multiple policy years when all the insurers were jointly and severally liable and each policy covered the full amount of the expenditures. Sonat also cites Newmont Mines, Ltd. v. Hanover Insurance Co., 784 F.2d 127 (2d Cir.1986), for the proposition that a jury should be allowed to decide damage on proof of a unitary damage number as between two occurrences. In Newmont, the insured sought coverage for damage to a building caused by two separate roof collapses. The insurers argued that the insured failed to prove the amount of damage that should be allocated to each occurrence. The court disagreed, stating:
“Because the two collapses were discovered only three days apart, they were repaired simultaneously and no effort was made at that time to allocate repair costs between the two collapses. The parties stipulated that the aggregate cost of repairing the building was $6,600,000 (Canadian). In addition, Newmont introduced the estimate of its engineering expert, Calder, that the cost of repairing the hole in the lower portion of the roof was $1,936,606; the balance of the aggregate $6,600,000 (Canadian) cost of repair, it followed, could be attributed to the second collapse. Hence, the jury’s finding of damages in the amount of $4,668,394 (Canadian) for the second collapse was arrived at not by speculation, as Hanover and Utica contend, but by simple subtraction ($6,600,000 — $1,936,606). The jury plainly was entitled to base its conclusions on Calder’s estimate, see W.L. Hailey & Co. v. County of Niagara, 388 F.2d 746, 753 (2d Cir.1967), and we find that the subtraction method described above provided a rational basis for computing damages attributable to the second occurrence with an acceptable degree of certainty, see Lexington Products, Ltd. v. B.D. Communications, Inc., 677 F.2d 251, 253 (2d Cir. 1982).”
784 F.2d at 137-38. Newmont indicates that the damages were not speculative when there was an estimate upon which the jury could base its damages.

Conclusion

Based on the foregoing, the judgment of the trial court made the subject of LMI’s appeal and of Sonat’s cross-appeal is due to be affirmed.
1110698 — AFFIRMED.
MOORE, C.J., and STUART, PARKER, SHAW, MAIN, WISE, and BRYAN, JJ., concur.
MURDOCK, J., dissents.
1110769 — AFFIRMED.
MOORE, C.J., and STUART, PARKER, MURDOCK, SHAW, MAIN, WISE, and BRYAN, JJ., concur.

. It is unclear when Sonat notified LMI of the contamination at the mercury-metering stations

. It is unclear from the briefs what contamination had occurred at these sites.

. The "liability insurance policies” referred to in the complaint are those "Known Primary, Umbrella and Excess General Liability Insurance Policies issued to [Sonat] by Certain Underwriters at Lloyd's” and listed in Appendix 1 to Sonat's complaint.

. The minority view "focuses on the effect of the insured’s action and considers each event or each injury a separate occurrence.” Owners Ins. Co. v. Salmonsen, 366 S.C. 336, 338, 622 S.E.2d 525, 526 (2005).

. LMI sometimes refers to "CU 1887” as “CV 1887.”